596 F.2d 378
 101 L.R.R.M. (BNA) 2315, 86 Lab.Cas. P 11,305
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Sequoia District Council of Carpenters, Intervenor,
v.
DON BURGESS CONSTRUCTION CORPORATION, d/b/a Burgess Construction,
and
Donald Burgess and Verlon Hendrix, d/b/a V & B Builders, Respondents.
 No. 77-3437.
 United States Court of Appeals,
Ninth Circuit.
 May 4, 1979.
 
 Elliott Moore, Deputy Assoc. Gen. Counsel, Christopher Katzenbach, Washington, D. C., for petitioner.
 David A. Rosenfeld, San Francisco, Cal., for intervenor.
 John M. Shelton, Chinello, Chinello, Maddy, Williams & Shelton, Fresno, Cal., George J. Tichy, II, James J. Meyers, San Francisco, Cal., for respondents.
 Application for Enforcement of an Order of The National Labor Relations Board.
 Before CHOY and SNEED, Circuit Judges, and BONSAL,* District Judge.
 SNEED, Circuit Judge:
 
 
 1
 This case is before us on the application of the National Labor Relations Board for enforcement of its order entered against Don Burgess Construction Corporation d/b/a Burgess Construction (BC) and Donald Burgess and Verlon Hendrix d/b/a V & B Builders (VB). The Board's decision and order is reported at 227 N.L.R.B. 765 (1977). On November 14, 1977, this Court granted the motion of the Sequoia District Council of Carpenters (Union) to intervene. This Court has jurisdiction of this proceeding under Section 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 88 Stat. 395, 29 U.S.C. § 151 et seq.), as the unfair labor practices found by the Board occurred at Fresno, California.
 
 
 2
 We find substantial evidence in the record as a whole to support the Board's findings and conclude that its order should be enforced.
 
 I.
 FACTS.
 
 3
 BC is a California corporation with its principal place of business in Fresno, California, engaged in business as a general contractor for light commercial construction. BC was formed in August 1973 with Donald Burgess as president, general manager and principal stockholder holding a 70 percent interest in the company.
 
 
 4
 In May 1974, BC decided to employ its own carpentry crew of several union carpenters including Verlon Hendrix as foreman. On June 6, 1974, Burgess signed a memorandum agreement with the Sequoia District Council of Carpenters binding BC to the terms of the 1971-1974 master area agreement. By its own terms this agreement expired on June 15, 1974.
 
 
 5
 In August 1974, Burgess and Hendrix made an oral agreement forming VB, a 50/50 partnership, which was to operate as a general contractor and carpentry subcontractor. Each partner contributed $250. The agreement was reduced to writing and signed nine months later. Upon formation of the partnership all the carpenters employed by BC were transferred to VB.
 
 
 6
 On August 6, 1974, Union business agent John Horn approached Burgess at the jobsite and requested Burgess to sign the Union's 1974-1977 master agreement. Burgess replied that BC was not interested in signing the agreement as it no longer employed carpenters. Burgess indicated that the carpenters working on the project were now employed by VB. When Horn asked whether VB would sign the agreement, Burgess said that he would discuss the matter with Hendrix. That same day Burgess signed a memorandum agreement binding VB to the terms of the 1974-1977 master agreement, with which VB has remained in full compliance.
 
 
 7
 In October 1974, Burgess wrote the Union stating that BC "is not a signatory to your agreement. If you feel you have recognition, please contact me." The Union's executive secretary, Lawrence Null, immediately called Burgess to determine whether Burgess denied signing the current Union contract. Burgess replied that all his carpenters were on VB's payroll and that BC would not be employing carpenters. Null was satisfied that the VB carpenters were protected under the signed agreement, their wages were correct, and contributions were being made on their behalf to the Trust Fund.
 
 
 8
 BC employed no carpentry employees of its own from August 1, 1974 until January 1975 at which time it began employing nonunion carpenters. BC did not apply the terms of the VB union contract to these new employees. In late March 1975, during a routine check of construction projects, Business Agent Horn discovered nonunion carpenters working at one of BC's projects. In a followup investigation a few days later, the project was back in compliance using only union workers. The union took no action.
 
 
 9
 On May 1, 1975, through another routine check, the Union again found nonunion carpenters working at the same BC jobsite. The Union picketed the jobsite from May 6 to May 9 to protest the use of the nonunion carpenters.
 
 II.
 
 10
 BOARD PROCEEDINGS.
 
 
 11
 On October 15, 1975, the Union filed an unfair labor practice charge against BC that alleged violations of section 8(a)(1), (3) and (5) of the Act. In its Decision and Order, the Board found, in agreement with the Administrative Law Judge, that the complaint was timely filed, that BC and VB were a single employer, that the carpenters employed by them constituted a single appropriate unit, and that the respondents, BC and VB, had violated section 8(a)(5) and (1) of the Act by refusing to bargain with the Union as the bargaining representative for BC's carpentry employees, by failing to apply the terms and conditions of the Union contract to those employees, and by unilaterally changing those employees' terms and conditions of employment. The Board also found that the respondents discriminated in violation of section 8(a)(3) and (1) of the Act by laying off union carpenters at VB while at the same time BC was hiring nonunion carpenters.
 
 
 12
 The Board's order requires BC and VB to cease and desist from the unfair labor practices so found, and in any other manner interfering with employees in the exercise of their rights under the Act. Affirmatively, the Board's order requires BC and VB to reinstate and make whole the employees unlawfully laid off; to recognize and bargain with the Union upon request; to give retroactive effect to the terms and conditions of the 1974-1977 collective bargaining agreement; to apply the terms of the agreement to the carpenters employed by BC; to make the BC carpenters whole for any wage losses they may have suffered from January 1975; to pay to the Union's trust fund any contributions required by the agreement; and to post appropriate notices.
 
 
 13
 Respondents attack the Board's order on numerous grounds. They invoke the protection of section 10(b) of the Act initially. Next they insist that the single employer finding has no basis in law or fact, that the carpenters employed by BC and VB do not constitute a single appropriate bargaining unit, that there existed no intent on the part of VB and the Union to extend the collective bargaining agreement to the employees of BC, that in any event there were no unfair labor practices, and that the Board's order violates federal antitrust law. Finally, respondents insist that the Board abused its discretion in denying their motion to reopen the record. None of these attacks strike home. We shall discuss each in the order of their recital above.
 
 III.
 
 14
 THE SECTION 10(b) ISSUE.
 
 
 15
 Section 10(b) of the Act on which the respondents rely provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board . . . ." 29 U.S.C. § 160(b) (1976). Respondents point out that under Local 1424, International Association of Machinists v. NLRB (Bryan Manufacturing Co.), 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) there must exist substantial evidence of unfair labor practices after April 15, 1975,[1] the date which is six months "prior to the filing of the charge with the Board," Viz. October 15, 1975. They correctly assert that the unfair labor practice charge based on BC's hiring of a separate nonunion carpentry crew beginning in late January 1975 involved events well before April 15, 1975. The Board, of course, does not disagree. Rather it invokes an exception to the statute of limitations of section 10(b). It concluded that knowledge of these events was acquired by the Union no earlier than May 1975, a time well within the prescribed six months. It also found that BC fraudulently concealed the unfair labor practice and thereby prevented the discovery and timely filing of the charge by the Union.
 
 
 16
 The general rule applicable to federal statutes of limitations is that "a limitation period begins to run 'when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged (violation).' " NLRB v. Allied Products Corp., 548 F.2d 644, 650 (6th Cir. 1977) (quoting Hungerford v. United States, 307 F.2d 99, 102 (9th Cir. 1962)); Accord, International Ladies Garment Workers Union v. NLRB, 150 U.S.App.D.C. 71, 86, 463 F.2d 907, 922 (1972). It is clear that fraudulent concealment tolls a statute of limitations. The Supreme Court stated:
 
 
 17
 Where a plaintiff has been injured by fraud and "remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party."
 
 
 18
 Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946) (quoting Bailey v. Glover, 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1874)). "This equitable doctrine is read into every federal statute of limitation," 327 U.S. at 397, 66 S.Ct. at 585, including section 10(b). International Ladies Garment Workers Union v. NLRB, 150 U.S.App.D.C. 71, 86, 463 F.2d 907, 922 (1972).[2]
 
 
 19
 Here the Board found that BC "fraudulently concealed" its unlawful employment of nonunion carpenters from the Union by assuring the Union on two occasions that it would no longer employ carpenters. The first was Burgess' conversation with Business Agent Horn on August 6, 1974 in which Burgess refused to sign the Union contract on behalf of BC because it was no longer employing carpenters. The Administrative Law Judge found that this statement " carried with it the reasonable implication that thenceforth V & B, and not Burgess Construction, would employ carpenters." 227 N.L.R.B. at 771. The second occasion was Burgess' conversation with Executive Secretary Null in October 1974. Although Burgess testified to the contrary, the Administrative Law Judge credited Null's testimony that Burgess assured him that BC would not be employing carpenters in the future. We recognize that such credibility resolutions will be sustained "unless found to be inherently incredible or patently unreasonable." NLRB v. Anthony Co., 557 F.2d 692, 695 (9th Cir. 1977); Accord, NLRB v. Dodson's Market, Inc., 553 F.2d 617, 619 (9th Cir. 1977). We, therefore, uphold the Administrative Law Judge's findings of credibility.
 
 
 20
 It is true as the respondents assert that fraudulent concealment tolls a statute of limitations only for as long as the concealment endures. Emmett v. Eastern Dispensary and Casualty Hospital, 130 U.S.App.D.C. 50, 57, 396 F.2d 931, 938 (1967). If the Union actually knew, or by the exercise of due diligence should have known about the alleged unfair labor practice, the statute would not be tolled. Id. at 55, 396 F.2d at 936; Westinghouse Electric Corp. v. City of Burlington, 122 U.S.App.D.C. 65, 67, 351 F.2d 762, 764 (1965). It is not true, as respondents contend, that the Board's finding that the Union failed to discover BC's hiring of nonunion carpenters until 1975 is unsupported by the record. Substantial evidence on the record so supports this finding.[3]
 
 
 21
 Direct evidence on this matter is contained in Secretary Null's testimony:
 
 
 22
 GENERAL COUNSEL: Subsequent to that conversation in October (1974), Mr. Null, did you receive any information concerning whether or not Mr. Burgess was employing nonunion, that is Burgess Construction was employing carpenters itself?
 
 
 23
 NULL: Prior to this (October 14) letter?GENERAL COUNSEL: No, after, anytime after?
 
 
 24
 NULL: The following year, early in the first of April, around the first of April.
 
 
 25
 GENERAL COUNSEL: Can you tell us how you acquired this information first of all?
 
 
 26
 NULL: Routine job check of the business agent John Horn brought in the report that he had found a couple of non-Union carpenters on the project at Gong's out at First and Bullard.
 
 
 27
 Reporter's Transcript at 391-92. From this testimony the Board inferred that April 1, 1975 was the first time Null suspected that BC was hiring nonunion carpenters, a suspicion he was able to confirm in May 1975. The record also reveals that the hiring of nonunion carpenters during this pre-10(b) period involved only a few workers. Specifically, in January, BC hired only one nonunion carpenter; in February, two; in March, three; in April, four. Under these circumstances it is not unreasonable to assume that only a routine check would alert the Union to this practice. The Board is free to make reasonable inferences based on direct and circumstantial evidence. See NLRB v. Anthony Co., 557 F.2d 692, 696 (9th Cir. 1977). Therefore, substantial evidence exists to support the conclusion that the Union neither knew nor should have known of BC's practice prior to May 15. In contrast, no evidence in the record indicates the Union had effective knowledge concerning BC's hiring of nonunion carpenters before May 1975.
 
 
 28
 It follows that the Board's holding that BC's fraudulent concealment tolled section 10(b) and that the October 15 charge is timely filed must be accepted.
 
 IV.
 
 29
 SINGLE EMPLOYER FINDING.
 
 
 30
 Having their strongest defense overrun by force of the record made in this case compels the respondents to take up even weaker positions. They insist, for example, they do not constitute a single employer. The Board held otherwise. On this record we must sustain the Board.
 
 
 31
 It is settled that the Board may treat two or more distinct business entities as a "single employer" for purposes of the Act.[4] In such cases, the criteria to which the Board looks in order to determine single employer status are (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. Radio Union v. Broadcast Service, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965), Quoted with approval in South Prairie Construction Co. v. Local 627, International Union of Operating Engineers, 425 U.S. 800, 802 n.3, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); Sakrete, Inc. v. NLRB, 332 F.2d 902, 905 (9th Cir. 1964), Cert. denied, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965). The Board has stressed the first three of these factors, as well as the presence of control of labor relations. Id. at 905 n.4 (quoting with approval from NLRB Twenty-First Annual Report at 14-15). However, no one of the factors is controlling, NLRB v. Welcome-American Fertilizer Co., 443 F.2d 19, 21 (9th Cir. 1971), nor need all criteria be present. Single employer status ultimately depends on "all the circumstances of the case" and is characterized as an absence of an "arm's length relationship found among unintegrated companies." Local 627, International Union of Operating Engineers v. NLRB, 171 U.S.App.D.C. 102, 107-108, 518 F.2d 1040, 1045-46 (1975), Aff'd on this issue sub nom. South Prairie Construction Co. v. Local 627, International Union of Operating Engineers, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976).
 
 
 32
 The Board's determination that BC and VB constitute a single employer for purposes of the Act is primarily factual, and should be sustained "if it has 'warrant in the record' and a reasonable basis in law." NLRB v. Hearst Publication, 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944), Cited in this context in Local 627, International Union of Operating Engineers v. NLRB, supra, 171 U.S.App.D.C. at 109, 518 F.2d at 1047. See also Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Our examination of the record indicates that the Board's determination meets this test. To demonstrate this we shall analyze the record from the standpoint of each of the relevant criteria.
 
 
 33
 A. Interrelation of Operations.
 
 
 34
 The record reflects unmistakably an interrelation of operations. At the time of VB's formation, BC's carpenters were simply transferred to the VB payroll, in the middle of the job, without interruption or change in their work. Hendrix continued to supervise the employees and continued to be paid union scale and to have pension contributions made on his behalf. VB used the same tools, previously purchased by BC, that the carpenters had been using before VB was created. In fact, VB did not purchase tools of its own until October 1975.
 
 
 35
 For the first year and a half of VB's operations all of its work came from BC which awarded almost all of its outside carpentry work to VB. The only exceptions were work VB did not request or which required specialized skills not possessed by either BC or VB employees. In most cases VB obtained its subcontracts from BC by direct negotiations rather than by bidding competitively against other subcontractors. VB did not bid on work for other contractors until the end of August 1975, and did not obtain any work from other contractors until January 1976. From August 6, 1974 to March 31, 1976, the value of services VB performed was as follows: For BC, $145,115; for California State University, $5,652; for Pacific Steel Erectors, $240. VB carpenters and BC carpenters often worked at the same project sites during the same general time periods. Hendrix worked alone on two BC jobsites and was paid by VB for that work.
 
 
 36
 Although BC and VB maintained separate payrolls and bank accounts and submitted separate tax returns and other reports to the State and Federal governments, they used the same accountant, Bob Minyard, who was a full-time BC employee. Until mid-1975 Minyard and Burgess prepared all of VB's financial reports to the Union's Trust Fund. The reports to the fund listed Burgess's home address as the office of VB before 1975 and BC's office address as that of VB from February to December 1975.
 
 
 37
 B. Common Management.
 
 
 38
 The record also reflects substantial evidence of common management. BC and VB are managed separately at the worker level. BC has its management staff which includes its president Donald Burgess, two project managers, and foreman Gerald Happeny. VB, on the other hand, is managed by Hendrix. There is record evidence, however, that Burgess directed a VB's employee's work on at least one occasion and that in 1974 VB employees, Kuykendall and Sharp, reported to BC's office for work assignments.
 
 
 39
 Burgess' control of VB at the policy level, as a consequence of the functional interrelation of the two companies, is quite significant. See Sakrete, Inc. v. NLRB, 332 F.2d 902, 907 (9th Cir. 1964). VB used Don Burgess' personal contractor's license until November 1975. Because contractor licenses are by California law nontransferable, Cal.Bus. & Prof.Code § 7075 (West 1975), the license remained that of Burgess. Moreover, even when VB was granted its license, Burgess was the "qualifying" individual who, under California law, "shall be responsible for exercising such direct supervision and control . . . as is necessary to secure full compliance with (the law) . . . ." Id. § 7068.1.
 
 
 40
 C. Centralized Control of Labor Relations.
 
 
 41
 There also exists substantial record evidence that Burgess made the policy decision regarding labor relations for both respondents. It was Burgess who decided to form a nonunion BC carpentry crew and asked BV carpenters Kuykendall and Sharp whether they wanted to participate on that basis. Burgess initially signed the 1971-1974 union contract on behalf of BC and later the 1974-1977 union contract on behalf of VB. Indeed, the record shows that the Union's dealings with both VB and BC were always with Burgess. Burgess, rather than Hendrix, prepared and submitted the VB monthly reports to the Union's Trust Fund until December 1974. Hendrix testified that he was unaware of the source of the first month's payment to the fund.
 
 
 42
 D. Common Ownership.
 
 
 43
 The record also reflects common ownership. Don Burgess owned 70% Of BC and was a 50% Partner in VB.
 
 
 44
 E. Conclusion.
 
 
 45
 To repeat, these facts, considered as a whole, amply demonstrate that the Board's finding that VB and BC constituted a single employer "has 'warrant in the record' and a reasonable basis in law." NLRB v. Hearst Publication, supra, 322 U.S. at 131, 64 S.Ct. at 861.
 
 V.
 
 46
 APPROPRIATE BARGAINING UNIT.
 
 
 47
 We now turn to the Board's determination that the employees of BC and VB constituted a single bargaining unit. The fact that two companies have been designated a single employer for purposes of the Act is not determinative as to whether both are bound by a union contract signed by one of them. This requires that the employees of each constitute a single bargaining unit. See South Prairie Construction Co. v. Local 627, International Union of Operating Engineers, 425 U.S. 800, 805, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976). Section 9(b) of the Act, 29 U.S.C. § 159(b) (1976), confers upon the Board a broad discretion to determine appropriate units "in order to assure to employees the fullest freedom in exercising the rights guaranteed by this (Act)." Our power of review is quite limited. We are not to overturn the Board's decision unless it is "arbitrary and capricious." See Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); Victoria Station v. NLRB, 586 F.2d 672, 675 (9th Cir. 1978); NLRB v. Allied Products Corp., 548 F.2d 644, 648 (6th Cir. 1977).
 
 
 48
 In determining the appropriateness of a bargaining unit the focus differs from that employed in deciding whether there is a single employer. "In determining whether a single employer exists we are concerned with the common ownership, structure, and integrated control of the separate corporations; in determining the scope of the unit, we are concerned with the community of interests of the employees involved." Peter Kiewit Sons' Co., 231 N.L.R.B. 76, 77 (1977). A community of interest among employees is evidenced by a similarity in their skills, duties, and working conditions. Pacific Southwest Airlines v. NLRB, 587 F.2d 1032, 1038 (9th Cir. 1978).
 
 
 49
 The Board, in finding that the carpentry employees of BC and VB constituted an appropriate unit, relied on "the fact that all of the employees possess the same skills, perform the same functions, share the same general working conditions, and usually work at the same situs." 227 N.L.R.B. at 765. The record supports this finding. The respondents, nevertheless, contend that the Board's finding is erroneous as a matter of law because the Board neither considered, nor found, that the new BC carpentry crew constituted an "accretion" to the existing VB employee unit.[5] It is true that the Board is called upon to make a determination of appropriate bargaining unit in several different procedural settings, one of which arises when a new group of employees is involved.[6] This case, however, does not present a setting in which the doctrine of accretion is properly applicable.[7] Accretion concerns whether certain employees should be absorbed into an existing unit. The issue here is what constitutes the proper existing unit. VB did not acquire BC nor did it employ BC to conduct its operations at a different location. Here a single employer, consisting of VB And BC, merely shifted work from the employees of VB to those of BC. If the employees of both constitute an appropriate bargaining unit because of their community of interests, there is no need for the Board to concern itself with accretion. Its failure to find "accretion" was not erroneous as a matter of law.
 
 
 50
 Nor do the respondents fare better when they argue that the Board must determine whether BC and VB employees constitute the Only appropriate unit. They insist that if BC employees could be an appropriate unit by themselves, any finding that accreted these employees to VB would be erroneous. The argument assumes that accretion is a relevant doctrine, an assumption already branded false. Furthermore, the law does not require representation in the most appropriate unit. Gallenkamp Stores Co. v. NLRB, 402 F.2d 525, 532 (9th Cir. 1968); Temple-Eastex, Inc., 228 N.L.R.B. 203, 209 (1977). The Board did not abuse its discretion in designating BC carpentry employees and VB carpentry employees as an appropriate bargaining unit.
 
 VI.
 
 51
 INTENT OF THE PARTIES.
 
 
 52
 The respondents' final effort to avoid the application to the employees of BC of the collective bargaining agreement consists of its insistence that the evidence establishes no intent of the parties to provide such coverage to BC's employees. They rely primarily on B & B Industries, Inc., 162 N.L.R.B. 832 (1967) and A-1 Fire Protection, Inc., 233 N.L.R.B. No. 9 (1977), 96 L.R.R.M. 1440.[8] Each can be distinguished from the instant case. In B & B the unions knew that they were dealing with two business entities, both employing persons performing similar work. The union's failure to obtain the signature of both companies to the contract indicated that it acquiesced in a contract covering only one company. A similar knowing acquiescence in a nonunion operation was found by the Board in A-1. Here the Board found that the Union relied on Burgess' assertions that BC did not intend to hire carpenters. The evidence thus indicates that the August 6, 1974 contract between VB and the Union was intended to cover All carpenters working for the operations of Donald Burgess. The Union never intended the contract to cover only a portion of such carpenters. Respondents intention argument fares no better than its predecessors.
 
 VII.
 
 53
 THE UNFAIR LABOR PRACTICES.
 
 
 54
 A. Violation of Section 8(a)(5) and (1).
 
 
 55
 Our deference to the Board's findings that BC and VB constitute a single employer and that their employees are an appropriate bargaining unit requires that we sustain the Board's determination that the respondents violated section 8(a)(5) and (1) of the Act by refusing to apply the terms of the union contract to the BC carpenters, thereby unilaterally changing the terms and conditions of their employment.[9] In addition, we must recognize that respondents had "a continuing duty to recognize the Union as the representative" of the BC employees, even without a specific request by the Union. See NLRB v. Triumph Curing Center, 571 F.2d 462, 474 (9th Cir. 1978). Failure to do so constitutes a violation of section 8(a)(5). The evidence is sufficient to support these findings.
 
 
 56
 B. Violation of Section 8(a)(3) and (1).
 
 
 57
 Respondents also violated section 8(a)(3) and (1) of the Act by discriminating between their union and nonunion employees in the single unit in allocating bargaining unit work and in selecting employees for layoff.[10] J. Howard Jenks d/b/a Glendora Plumbing, 165 N.L.R.B. 101, 102 (1967).
 
 
 58
 The Board found that the respondents discriminated by shifting bargaining unit work from VB's union carpenters to BC's nonunion crew during the January-September period. This finding was based on the facts that during this period (1) the number of VB carpenters was reduced from five to two while the number of BC carpenters was increased from one to eight, and (2) the number of hours VB carpenters worked was reduced from 652 hours to 347 hours per month while the hours worked by BC carpenters was increased from 135 hours to 1165.5 hours per month. In addition, all of this work was on BC projects, the majority of which used both VB and BC carpenters performing similar work at the same jobsites.
 
 
 59
 The Board found that this deliberate shifting caused the discriminatory layoff of VB union employees Pinnel, Ellis and Gomez in violation of section 8(a)(3) and (1) of the Act. VB's payroll records show that employees were typically retained from one project to the next. At the time of the layoff of these union carpenters, four nonunion carpenters were working for BC. The Board could reasonably conclude that the discrimination between employees was based solely on the fact that the VB carpenters were covered by the contract while it was thought the BC carpenters were not. Accordingly, the layoffs violated section 8(a)(3) and (1) of the Act.
 
 VIII.
 
 60
 VIOLATION OF FEDERAL ANTITRUST LAWS.
 
 
 61
 Respondents' contention that the Board's order violates the antitrust laws need not be considered. Its assertion is untimely. Not having asserted the violation before the Administrative Law Judge or the Board, we are precluded by section 10(e) from considering it here.[11] NLRB v. Ochoa Fertilizer Corp., 368 U.S. 318, 322, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961); NLRB v. Apico Inns, Inc., 512 F.2d 1171, 1174 (9th Cir. 1975).
 
 IX.
 
 62
 DENIAL OF MOTION TO REOPEN THE RECORD.
 
 
 63
 Respondents earnestly contend that the Board abused its discretion in denying respondents' motion to reopen the record to receive three affidavits purporting to show: (1) that Union Executive Secretary Null had testified falsely when he stated that the first time he knew of BC's nonunion carpenters was in May 1975, and (2) that the Union contract with VB was not intended to be binding on BC. The Board denied the motion as "failing to state a sufficient basis for granting such a motion." 227 N.L.R.B. at 765 n.2. We have examined the record as it pertains to this motion particularly carefully because of its obvious importance to the section 10(b) issue discussed in Part III of this opinion. Nonetheless, we leave the Board's denial intact.
 
 
 64
 The grant or denial of a motion to reopen the record rests in the Board's discretion. NLRB v. Victor Otlans Roofing Co., 445 F.2d 299 (9th Cir. 1971). The Board's Rules and Regulations, Series 8, as amended (29 C.F.R.), section 102.48(d)(1) provide that:
 
 
 65
 A motion to reopen the record shall state briefly the additional evidence sought to be adduced, why it was not presented previously, and that, if adduced and credited, it would require a different result. Only newly discovered evidence, evidence which had become available only since the close of the hearing, or evidence which the Board believes should have been taken at the hearing will be taken at any further hearing.
 
 
 66
 Accordingly, it was respondents' burden to show the materiality of the proffered evidence and why it was not introduced at the hearing. NLRB v. West Coast Casket Co., 469 F.2d 871, 873 (9th Cir. 1972). We agree that the respondents failed to meet their burden. Thus, denial of respondents' motion to reopen the record was not an abuse of discretion.
 
 
 67
 ORDER ENFORCED.
 
 
 
 *
 Hon. Dudley B. Bonsal, Senior United States District Judge, for the Southern District of New York, sitting by designation
 
 
 [1]
 Local 1424, International Association of Machinists v. NLRB (Bryan Manufacturing Co.), supra, distinguished between two kinds of situations. The first is when the occurrences within the relevant six months period constitute in and of themselves unfair labor practices. A complaint based on these occurrences would be timely filed. Id. at 416, 80 S.Ct. 822. As section 10(b) is characterized as a statute of limitations and not a rule of evidence, Id. at 416 n. 6, 80 S.Ct. 822, evidence of events occurring outside the six-months period may be used to "shed light" on events within the six-months period, but the evidence of a violation within the relevant time period must be substantial in its own right. NLRB v. MacMillan Ring-Free Oil Co., 394 F.2d 26, 33 (9th Cir.), Cert. denied, 393 U.S. 914, 89 S.Ct. 237, 21 L.Ed.2d 199 (1968)
 In the second situation occurrences within the relevant six-months period can be deemed unfair labor practices only "through reliance on an earlier unfair labor practice." 362 U.S. at 417, 80 S.Ct. at 827. Cases within this category are barred by section 10(b).
 
 
 [2]
 Another circuit has set forth the following required elements for tolling a statute of limitations: (1) fraudulent concealment by the party raising the statute together with (2) the other party's failure to discover the facts which are the basis of his cause of action despite (3) the exercise of due diligence on his part. Charlotte Telecasters v. Jefferson-Pilot Corp., 546 F.2d 570, 574 (4th Cir. 1976). The party seeking the benefit of the avoidance of the statute of limitations carries the burden of proof to establish the elements. Id. at 574 n. 3. Moreover, all presumptions are against him since his claim to exemption is against the current of the law and is founded on exceptions. Akron Presform Mold Co. v. McNeil Corp., 496 F.2d 230, 233 (6th Cir.), Cert. denied, 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974)
 
 
 [3]
 Section 10(e) of the Act directs that "(t)he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e) (1976). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)
 
 
 [4]
 Section 2 of the Act provides, in relevant part:
 (1) The term "person" includes one or more individuals, labor organizations, partnerships, associations, (or) corporations . . . .
 (2) The term "employer" includes any person acting as an agent of an employer, directly or indirectly . . . .
 29 U.S.C. § 152(1), (2) (1976).
 
 
 [5]
 "Accretion" is merely the addition of new employees to an existing group. NLRB v. Food Employers Council, Inc., 399 F.2d 501, 503 (9th Cir. 1968). The most obvious example of an accretion is addition of employees through normal turnover. Any union contract already binding on the group would automatically be extended to these employees
 
 
 [6]
 R. Gorman, Basic Text on Labor Law 70 (1976) gives the following four procedural settings:
 (a) Initial organization, when there is no history of collective bargaining; (b) Severance, when there is an existing unit . . . and a group of employees wish to split off from the larger group and to bargain separately; (c) Accretion, the opposite of severance, when there is an existing unit and through merger or other acquisition a group of employees (whether organized or not) is absorbed into the existing business enterprise; and (d) Unit clarification, when the creation of a new job or the change in description of an existing job (and accretion as well) creates uncertainty as to the inclusion of those jobs in or their exclusion from an existing unit.
 
 
 [7]
 Analysis of whether a new group of employees is an accretion to an existing unit rather than a separate bargaining unit is important in such situations as the following:
 (1) Mergers. See, e. g., Temple-Eastex, Inc., 228 N.L.R.B. 203 (1977).
 (2) A multiple location employer adding a new unit. See, e. g., Sheraton-Kauai Corp. v. NLRB, 429 F.2d 1352 (9th Cir. 1970); NLRB v. Sunset House, 415 F.2d 545 (9th Cir. 1969); Peter Kiewit Sons' Co., 231 N.L.R.B. 76 (1977); Meijer, Inc., 222 N.L.R.B. 18 (1976).
 (3) A union contract which is newly interpreted to cover a distinct, separately identifiable group of employees. See, e. g., NLRB v. Food Employers Council, Inc., 399 F.2d 501 (9th Cir. 1968) (Retail Clerks Union claims to represent snack bar employees).
 In these circumstances it must be determined whether these employees will be unreasonably disenfranchised regarding union membership if they are "accreted" to the existing union. See NLRB v. Sunset House, 415 F.2d 545, 547 (9th Cir. 1969).
 
 
 [8]
 In both cases the Board refused to extend a union contract of a fully integrated single employer to the nonunion unit because there was no evidence that there was ever any agreement to cover this unit. The respondents argue that BC expressly rejected the union contract on August 6, 1974 and made it clear in the October 14, 1974 letter that BC did not intend to be bound by the union contract with VB. Furthermore, the Union only intended to cover the VB employees, which it has done
 
 
 [9]
 Where the employees of business entities forming a single employer also constitute a single appropriate unit, a collective bargaining agreement signed by part of a single employer is binding on the single employer as a whole, and the employer is obligated to give effect to the agreement as to all employees within the single appropriate unit. Either failure to apply material terms of the agreement or unilateral changes in those terms as to part of the unit employees violates section 8(a)(5) and (1) of the Act. Local 627, International Union of Operating Engineers v. NLRB, 171 U.S.App.D.C. 102, 108, 109, 518 F.2d 1040, 1046-47 (1975); NLRB v. Royal Oak Tool & Machine Co., 320 F.2d 77, 80-83 (6th Cir. 1963); J. Howard Jenks d/b/a Glendora Plumbing, 165 N.L.R.B. 101, 102 (1967). See also South Prairie Construction Co. v. Local 627, International Union of Operating Engineers, 425 U.S. 800, 801, 803, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); NLRB v. Katz, 369 U.S. 736, 742-43, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962)
 
 
 [10]
 Section 8(a) of the Act provides, in relevant part, that it is an unfair labor practice for an employer
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.
 29 U.S.C. § 160(e) (1976).
 
 
 [11]
 Section 10(e) provides, in relevant part, that "(n)o objection that has not been urged before the Board . . . shall be considered by the court . . . ." 29 U.S.C. § 160(e) (1976)