**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Douglas LANTZ, d/b/a Transportation Consultants, Alcan Forwarding Company, and/or AFCO, Respondent.**

No. 78-2399.

United States Court of Appeals, Ninth Circuit.

Oct. 29, 1979.

R. Michael Smith, NLRB, Washington, D. C., argued, for petitioner; Elliott Moore, NLRB, Washington, D. C., on brief.

A. Stevenson Bogue, Nelson, Harding, Yeutter, Leonard & Tate, Lincoln, Neb., for respondent.

Before HUFSTEDLER and ANDERSON, Circuit Judges, and GRANT,* District Judge.

GRANT, District Judge:

This case is before the court on the application of the National Labor Relations Board (hereinafter "Board") for enforcement of its order entered against Respondent Douglas Lantz, which is reported at 235 NLRB 140. The court has jurisdiction over this proceeding under Section 10(e) of the National Labor Relations Act (hereinafter "Act"), as amended, 29 U.S.C. § 151, et seq., as the unfair labor practices found by the Board occurred within the State of Alaska. There is no dispute that respondent's operation satisfied the Board's jurisdictional requirements and that it is an employer engaged in commerce within Section 2(2), (6), and (7) of the Act. Between March 28 and May 20, 1977, the International Brotherhood of Teamsters, Local Union No. 959 (hereinafter "Union") filed charges against respondent alleging certain violations of Sections 8(a)(1), (3) and (5) of

the Act. A hearing was held before an administrative law judge on September 13 and 14, 1977.

The administrative law judge's decision of December 21, 1977, which was adopted without significant modification by the Board, is the basis of the following rendition of the facts:

Alcan Forwarding Company ("Alcan") and Transportation Consultants ("TC") are Alaskan trucking businesses organized in 1972 by Douglas Lantz. Lantz; Jean Lantz, his wife; and Gayle Yotter, his step-daughter, were Alcan's incorporators as well as its president, vice president, and secretary-treasurer, respectively. Lantz and Jean Lantz were TC officers and Yotter was one of its incorporators. TC owned rolling stock—ten truck-tractors and eight trailers designed for transportation of bulk materials used in oil well exploration. In September, 1975, the State of Alaska dissolved Alcan's certificate of incorporation for failure to file annual reports and/or to pay fees.

In December, 1975, Lantz, on behalf of TC, and Richard Mettle, an employee of a division of Dow Chemical ("Dowell"), reached an agreement committing TC to furnish rolling stock, including its maintenance, in aid of Dowell's hauling activities between Fairbanks and Alaska's North Slope.

At about the same time, Lantz alleges that a firm known as AFCO contracted with Dowell to provide drivers and fuel for TC's rolling stock. Lantz testified that AFCO was operated by a James Taylor, and that he, Lantz, had no interest in or control over it. AFCO's inclusion in the arrangement was necessitated, Lantz continued, by an Interstate Commerce Commission ("ICC") prohibition against both equipment and drivers being under common control absent common-carrier authorization. Lantz would have this court believe that any violations of Section 8(a)(3) and (5) in

the present case were perpetrated by Taylor's AFCO and not by any venture with which he was or is associated.

Lantz testified that Dowell's representative in the arrangements just described was the same Richard Mettle with whom Lantz had reached an agreement in December 1975. The record contains no documentation of the Taylor arrangements, and neither Mettle nor Taylor testified.

In contradiction of Lantz's avowed noninvolvement with AFCO—which is to say, with the driver aspect of the Dowell venture—the record contains a written contract dated January 7, 1976, in which Alcan Forwarding, *identified in the contract as AFCO for short,* agreed to provide "experienced line drivers and arrange truck fueling as requested by Dowell." The document was signed for Alcan Forwarding by Gayle A. Yotter, Lantz's stepdaughter and corporate secretary-treasurer, and for Dowell by Mettle—the person who supposedly had extracted the same commitment from Taylor's AFCO the month before.

Furthermore, on January 7, 1976, the day she contracted with Dowell in the name of Alcan Forwarding—Yotter additionally signed a collective bargaining contract with the Union to cover those "employed as Teamsters, Drivers, Chauffeurs, Warehousemen, or as employees under any classification within the jurisdiction of the Union." The agreement provided that the Union's exclusive hiring hall would refer to Alcan "qualified workmen" for whom Alcan was required to make welfare and pension contributions to designated Union trust funds. The agreement also was to remain in effect "until June 30, 1977, and . . . thereafter from year to year," subject to renegotiation upon proper notice. On January 7th and 8th, 1976, four employees were dispatched and the first Dowell load departed Fairbanks on January 14th.

The Dowell venture operated out of a shop building and adjoining office structure leased by TC and located in Fairbanks. The TC rolling stock was garaged and maintained in the shop and the drivers were dispatched on Dowell hauls from this point.

In the latter half of January, petitioner contends that Jodi Collins became the venture's dispatcher for drivers and shared the office space with TC. Respondent contends that Collins was designated by James Taylor to be only AFCO's day-to-day representative. Testimony revealed that TC and Collins had a single telephone which Collins answered and that TC provided Collins with a motor vehicle and living quarters. Both Collins and Lantz interviewed job applicants and Lantz had the right to veto the hiring of any driver, and did so at least once. On occasion Lantz also dispatched drivers on Dowell hauls. When Lantz was not present in Fairbanks—a frequent occurrence—he relied on Collins to "tell [him] what was happening" with regard to the venture, and also transmitted instructions to her. In response to such instructions, Collins discharged some TC employees.

On January 16, 1976, Larry Harness was dispatched to Alcan as a teamster mechanic. Shortly before January 28th, Charles Clark was interviewed by Lantz in the venture's office for a position. On January 28th, Clark was dispatched to Alcan as a mechanic, and for the first two or three weeks of their employment, Harness and Clark worked as mechanics. Thereafter they worked mainly as line drivers, although they continued to do maintenance. The Union continued dispatching drivers and mechanics to Alcan through May 1976.

From January to March, Harness and Clark, as well as the other drivers and mechanics, were paid on a single payroll maintained under the "AFCO" style. All billings to Dowell in connection with the venture were in the name of AFCO. During this period, Alcan also began forwarding to the Union, on behalf of the referred drivers and mechanics, the pension/welfare contributions required under the bargaining agreement.

From January to March 1976, the administration of the Union trust fund received reports from Alcan, signed by Jodi Collins, which listed compensable hours for both driving and maintenance time.

Sometime in March, the venture's maintenance time began being paid from a TC account, while driving time continued to be paid from an "AFCO" account. Separate books were thereafter kept for the TC and driving aspects of the venture, but Jean Lantz did the payroll computations for both. TC checks were signed by Jean Lantz and checks for driving time, under the "AFCO" style, were signed by Collins. At about the time of the payroll change, Alcan ceased making Union pension/welfare contributions for maintenance time.

In May, the Union trust fund office commenced a collection action against Alcan and Yotter for liquidated damages incurred as a result of Alcan's late filing of the January transmittal report. On June 4th, Lantz met with a Union business agent and other Union officials. The parties discussed shortages in Alcan's pension/welfare and dues checkoff contributions and the liquidated damages for Alcan's late filing of the January transmittal report. The Union indicated to Lantz that one of its problems was its inability "to contact anyone from [Alcan]". Lantz was asked if Jodi Collins was still his office manager. He replied that she was and gave a corrected address, as well as agreeing to pay Alcan's pension/welfare and dues arrearages.

In connection with Alcan's arrearages, union officials inspected Alcan's books, which were then maintained under the "AFCO" style. Subsequently, Alcan cured its delinquencies and the lawsuit was dismissed.

In July or August 1976, Clark and Harness learned that pension/welfare contributions were no longer being made for maintenance work. They asked Lantz what was happening. Lantz responded that he "could not afford to pay union scale for mechanical work, and if the employees wanted to keep receiving that portion of their pay, they would have to work non-union." Lantz further stated that the "maintenance shop was going completely non-union" and if they did not want to work non-union they could go without their paychecks. Subsequently, Clark and Harness were relieved of all mechanical work.

After September, Alcan ceased making pension/welfare contributions for driving time. In December, Clark asked Lantz about the continuing non-payment of driver's benefits, declaring that he was going to the Union to get his pay straight. Lantz responded with some four-letter words as descriptive of his ideas about the Union and stated that he was getting rid of his Union drivers and operate on a "gypo" (non-union) basis.

On January 19 and 20, 1977, Clark and Harness, respectively, finished their last trips for the venture. Thereafter, following normal practice, they called the office on a daily basis to inquire about further runs. They usually spoke with Collins, but sometimes with Lantz, and were told each time that there was no work. On one occasion, Lantz told Clark that rumors about continued trips were none of his business. Eventually, Clark and Harness quit calling, and after they ceased being used, Clark testified that Al Kaiser, an independent trucker, continued making runs for the Dowell venture. Clark's testimony was accepted as credible by the Board, although respondent alleges a total closedown of operations.

The Board found that Douglas Lantz, d/b/a TC, Alcan and/or AFCO constituted a single employer—the company; that its drivers and mechanics formed a single appropriate unit; and that the company violated Section 8(a)(5), (3) and (1) of the Act by repudiating its bargaining agreement and relationship with the Union; by discontinuing the employment of Charles Clark and Larry Harness because of their efforts to obtain compliance with the agreement; and by threatening its employees with going out of business or replacing them with non-union "gypos".

The Board's decision included a make-whole order for lost earnings and benefits and required reinstatement, recognition of the Union, and retroactive effect to the bargaining agreement.

The court is faced with the following issues:

(1) Whether substantial evidence in the record as a whole supports the Board's findings that Douglas Lantz, d/b/a Transportation Consultants, Alcan Forwarding Company and/or AFCO, constitutes a single employer, and that its drivers and mechanics form a single appropriate unit.

(2) Whether the respondent violated Sections 8(a)(1)(3) and (5) of the Act by threatening its employees with going out of business or replacing them with "gypos"; by discontinuing the employment of Charles Clark and Larry Harness because of their efforts to obtain company compliance with the bargaining agreement; and by repudiating the bargaining agreement and bargaining relationship with the Union.

*ISSUE I—Single Employer Status and Single Unit Determination.*

In *N.L.R.B. v. Don Burgess Constr. Corp.*, 596 F.2d 378 (9th Cir. 1979), this court restated the single employer doctrine:

It is settled that the Board may treat two or more distinct business entities as a "single employer" for purposes of the Act.[4] In such cases, the criteria to which

[4] Section 2 of the Act provides, in relevant part:

(1) The term "person" includes one or more individuals, labor organizations, partnerships, associations, [or] corporations.

. . .

(2) The term "employer" includes any person acting as an agent of an employer, directly or indirectly . . . . .

29 U.S.C. § 152(1), (2) (1976).

the Board looks in order to determine single employer status are (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *Radio Union v. Broadcast Service, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965) *quoted with approval in South Prairie Construction Co. v. Local 627, International Union of Operating Engineers*, 425 U.S. 800, 802 n. 3, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); *Sakrete, Inc. v. N.L.R.B.*, 332 F.2d 902, 905 (9th Cir. 1964), *cert. denied*, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965). The Board has stressed the first three of these factors, as well as the presence of control of

labor relations. *Id.* at 905 n. 4 (quoting with approval from *N.L.R.B. Twenty-First Annual Report* at 14–15.) However, no one of the factors is controlling, *N.L.R.B. v. Welcome-American Fertilizer Co.*, 443 F.2d 19, 21 (9th Cir. 1971), nor need all criteria be present. Single employer status ultimately depends on "all the circumstances of the case" and is characterized as an absence of an "arm's length relationship found among unintegrated companies." *Local 627, International Union of Operating Engineers v. N.L.R.B.*, 171 U.S.App.D.C. 102, 107–108, 518 F.2d 1040, 1045–46 (1975), *aff'd on this issue sub nom. South Prairie Construction Co. v. Local 627, International Union of Operating Engineers*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976).

596 F.2d 378, 384.

In the case at bar, it is respondent's contention that the Board based its finding of single employer status on only one of the four criteria, interrelation of operations, and that if the Board would have examined the facts in light of the other criteria, the single employer finding would not be supported. Specifically, respondent alleges that the record lacks any evidence of common ownership between AFCO and TC, common management, or any centralized control of labor relations.

The Board's conclusion that a corporation constitutes a single employer is essentially a factual one and not to be disturbed provided substantial evidence in the record supports the Board's findings. *N.L.R.B. v. C. K. Smith & Company*, 569 F.2d 162, 164 (1st Cir. 1977), *cert. denied* 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978). We hold that there is substantial evidence in the record to support the Board's finding of single employer status.

(i) The record clearly supports, and respondent does not seriously contest, a finding of interrelation of operations between TC and Alcan/AFCO. TC was to supply the rolling stock and its maintenance, and Alcan the drivers. The venture operated out of a single building which was serviced

by a single telephone. Employees did both maintenance and driving for the venture, and initially, Alcan forwarded pension and welfare contributions to the Union on behalf of all the venture's referred employees, for both mechanical and driving time. Likewise, all payroll checks were initially paid under the "AFCO" style, which the Board has found to be merely an acronym for Alcan Forwarding Company, as is used in the Dowell contract.

(ii) The record supports a finding of common management. Testimony at the hearing established that Lantz had formed both TC and Alcan in 1972 and participated in the hiring and firing of the venture's drivers. In June 1976, when Lantz met with Union officials to resolve the problem of Alcan's being in arrears in its pension/welfare contributions to the Union, Lantz not only assured the Union that Alcan's delinquencies would be remedied but, as Union Official Braeger credibly testified (R. 25, n. 2), Lantz stated that Jodi Collins, whom TC had supplied with office space and a vehicle, was his office manager. Further testimony established that Collins dispatched the drivers; "Jodi Collins" signatures appear on Alcan's pension/welfare transmittal forms; Collins participated in the hiring of drivers and firing of mechanics; she answered TC calls and during Lantz's frequent absences was, by Lantz's admission, the "conduit" for his indirect supervision of TC employees and also the person on whom he relied generally to tell him what was happening with regard to the venture. This confirmed not only Collins' dual functions in the integrated management of the venture, but also her responsibility to Lantz.

Unity of management is further demonstrated through the roles played by Jean Lantz and Yotter, Lantz's wife and stepdaughter: Jean Lantz was an officer and incorporator of both TC and Alcan and Yotter was Alcan's Secretary-Treasurer and an incorporator of TC; Yotter signed Alcan's contract with Dowell and its bargaining agreement with the Union; Jean Lantz did the TC and Alcan bookkeeping.

(iii) The record indicates that there was centralized control of labor relations. Such control was initially effected through Alcan's bargaining agreement which, until repudiated, shaped labor relations for the entire venture. Pursuant to that agreement, the venture's employees were referred for both mechanical and driving work; Alcan initially paid pension/welfare contributions for both types of labor; and Lantz took it upon himself to assure union officials in June that those contributions would be kept current. Lantz and Collins, the central management figures, shared in all the significant daily decisions affecting the venture's employees: hiring, firing, and dispatching. When Lantz was absent, Collins carried out his instructions regarding supervision of mechanics as well as continuing her regular dispatch of drivers.

(iv) With respect to common ownership, the record merely contains respondent's testimony, through witnesses Lantz and Yotter, that AFCO was a separate entity, over which Lantz, TC and Alcan had no control. Neither Taylor, Collins, nor Mettle, Dowell's representative, testified. Although these witnesses cannot be said to have been within the control of respondent, they were presumably personal and business acquaintances of Lantz and it is, therefore, proper for the Board to draw an adverse inference. Respondent's production of Lantz's weak hearsay testimony regarding an independent AFCO, when strong direct evidence could have been supplied, can only lead to the conclusion that the strong evidence would have been adverse. *N.L.R.B. v. C. K. Smith & Co., supra*, at 164; see 48 Am. Jur.2d *Labor and Labor Relations* § 1482. It should be noted that at the hearing and in his appellate brief, Lantz has argued that one James Taylor was the owner/operator of the separate entity AFCO; however, in his Answer to Consolidated Complaint, dated July 18, 1977, Lantz avers that "AFCO is a wholly owned DBA of Jodi Collins", without any mention of, what the administrative law judge has described as, the evanescent James Taylor.

In opposition to respondent's claim of an independent AFCO, the record reveals the

following evidence that suggests that AFCO is merely an acronym for Alcan Forwarding Company: that the Union's referrals were made to Alcan, and that at one time Alcan made payments for pension/welfare benefits on behalf of all referred employees.

Respondent argues that because Alcan's certificate of incorporation was dissolved in September 1975, Yotter, in January 1976, as an officer of the then defunct Alcan, had no authority to enter into any contracts with Dowell or the Union. This argument will be discussed in greater detail below, regarding the Section 8(a)(5) violation, but for purposes of the common ownership issue, it is enlightening to examine the Board's reasoning for finding AFCO merely an acronym:

> Even if it were believable that Yotter, when entering into the driver contract with Dowell, was on some kind of frolic of her own, it is utterly implausible that Mettle would have drawn Dowell into the same frolic had there been a prior, identical deal with a different and unrelated AFCO. It also defies belief that Yotter's same-day entry into a bargaining agreement with the Union, which plainly meshed with the driver contract and obviously anticipated the start of operations, was yet another unauthorized frolic—particularly since the Lantz organization, by whatever name, complied with the agreement in significant detail for a time afterwards.

(R. 27)

■ The above facts, when considered as a whole, demonstrate that the Board's finding of single employer status has warrant in the record, and a reasonable basis in law. *N.L.R.B. v. Don Burgess Constr. Co., supra,* at 386; *N.L.R.B. v. Hearst Publications,* 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). In addition, a finding of the Board cannot be considered to be without substantial support in the evidence merely because either of two inconsistent inferences might have been drawn from the evidence. The general rule is that if more than one inference can be drawn from a set of facts, the Board's inference will control unless unreasonable. *Hertzka & Knowles v. N.L.R.B.,* 503 F.2d 625 (9th Cir. 1974), *cert. denied,* 423 U.S. 875, 96 S.Ct. 144, 46 L.Ed.2d 106 (1975).

With respect to the Board's determination that all drivers and mechanics working for TC and Alcan/AFCO constituted a single bargaining unit, we again quote from our recent opinion in *Don Burgess, supra* :

> The fact that two companies have been designated a single employer for purposes of the Act is not determinative as to whether both are bound by a union contract signed by one of them. This requires that the employees of each constitute a single bargaining unit. *See South Prairie Construction Co. v. Local 627, International Union of Operating Engineers,* 425 U.S. 800, 805, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976). Section 9(b) of the Act, 29 U.S.C. § 159(b) (1976), confers upon the Board a broad discretion to determine appropriate units "in order to assure to employees the fullest freedom in exercising the rights guaranteed by this [Act]." Our power of review is quite limited. We are not to overturn the Board's decision unless it is "arbitrary and capricious." *See Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); *Victoria Station v. NLRB,* 586 F.2d 672, 675 (9th Cir. 1978); *NLRB v. Allied Products Corp.,* 548 F.2d 644, 648 (6th Cir. 1977).

In determining the appropriateness of a bargaining unit the focus differs from that employed in deciding whether there is a single employer. "In determining whether a single employer exists we are concerned with the common ownership, structure, and integrated control of the separate corporations; in determining the scope of the unit, we are concerned with the community of interests of the employees involved." *Peter Kiewit Sons' Co.,* 231 N.L.R.B. 76, 77 (1977). A community of interest among employees is evidenced by a similarity in their skills, duties, and working conditions. *Pacific*

*Southwest Airlines v. NLRB,* 587 F.2d 1032, 1038 (9th Cir. 1978).

596 F.2d 378, 386.

■ In the case at bar, the record supports a single unit determination, in that the bargaining agreement covered not only "drivers", but also "any other employees under any classification within the jurisdiction of the Union." Pursuant to that agreement, the Union referred both drivers and mechanics to the company and some referred employees interchangeably performed both driving and maintenance work. All were employed to further the Dowell venture, and work originated from the same Fairbanks job site. We hold that the above facts establish the requisite community of interest to support the Board's determination.

*ISSUE II—Whether Respondent Violated Sections 8(a)(1), (3) and (5) of the Act.*

*II–A—Independent Section 8(a)(1) Violations.*

■ It is established that § 8(a)(1) of the Act prohibits interference, restraint or coercion of employees in the exercise of their rights given in § 7 of the Act, which includes the right to seek union assistance when an employee feels his rights under a collective bargaining agreement are being violated. Under § 8(a)(1), verbal communication from an employer may not contain threats of reprisal such as suggesting an operation will close down if employees become unionized. *N. L. R. B. v. Gissel Packing Co.,* 395 U.S. 575, 617–619, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *N. L. R. B. v. L. B. Foster Co.,* 418 F.2d 1, 2–3 (9th Cir. 1969), *cert. denied* 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970). It is likewise a violation of § 8(a)(1) if an employer threatens a closedown, that is within his sole discretion for reasons unrelated to economic necessities, when an employee indicates he will seek union assistance in attaining compliance with a collective bargaining agreement.

■ In the case at bar, the testimony established:

(a) That Lantz declared to Harness in December 1976, when Harness questioned respondent's failure to institute a wage increase the previous July as prescribed by the bargaining contract, that he "would just shut the doors and close the son-of-a-bitch" if required to grant the increase.

(b) That, in December 1976, when Clark spoke of going to the Union over respondent's nonpayment of fringe-benefit contributions, Lantz responded with his four-letter description of the Union and stated he was going to get rid of its employee-drivers and operate strictly on a gypo [non-union] basis.

(c) That sometime after Clark's last trip—probably around February 1st—Lantz told him of an intention to operate on a gypo basis to circumvent union scale.

(d) That, in January 1977, Collins stated, to Harness' announced intention to go to the Union over the fringe-benefit matter, that Lantz had said he would "close the doors when it gets too tough."

This court must conclude that the Board was correct in giving credibility to the testimony of witnesses Clark and Harness, and in finding witness Lantz's testimony lacking in credibility. The above statements show a clear-cut anti-union animus which, when coupled with Clark's (Tr. 90, 91) and Harness' (Tr. 115, 116) testimony of continued operation on a non-union basis, establishes verbal threats not protected by the free speech provisions of § 8(c), and in violation of § 8(a)(1) of the Act. We are not persuaded by respondent's argument that Lantz's statements were merely predictions of a certain economic fate in the billings-gate.

*II–B—Violation of Section 8(a)(3) and (1) by Discontinuing Employment of Clark and Harness.*

The Board concluded that § 8(a)(3) and (1) had been violated in that respondent's failure to employ Clark and Harness after January 20, 1977, was motivated in large part by their protected efforts to enforce the Union contract and their suggestions that they would go to the Union to that end.

■ The first objection of respondent is that the record lacks substantial evidence that a discharge actually took place. It is argued that employees Harness and Clark received no further work because of a general closedown. Respondent mistakenly suggests that Clark himself testified that another separate company had replaced respondent in February 1977. A review of the transcript reveals that to be an erroneous account of Clark's testimony. Clark testified that as of the hearing date, September 1977, respondent was no longer running loads for Dowell. Clark further stated that a company by the name of R. D. Alaska began running loads for Dowell in February 1977. The crucial assumption that respondent makes is that as of February 1977, R. D. Alaska had completely replaced respondent's operation; however, that assumption does not necessarily follow from Clark's testimony. It is possible to interpret Clark's testimony as being consistent with Harness's testimony that respondent continued operations subsequent to January 1977 by realizing that both respondent's non-union driver and R. D. Alaska could have been making runs for Dowell between January and September 1977.

Respondent next argues that even if the Board proved discharges, the discharges were justified in that the employees personally insulted management, Mr. Lantz, while speaking with Jodi Collins regarding their final paychecks. Collins had ordered the two employees off her property after either Clark or Harness had stated that Lantz was "kind of a crook". We are not persuaded by respondent's suggestion of justified discharge based upon employee misconduct, in that this minor incident occurred subsequent to Lantz's decision to go non-union.

■ Respondent next cites *Western Exterminator Co. v. N. L. R. B.*, 565 F.2d 1114 (9th Cir. 1977) to argue that it is the Board's burden to prove that, with respect to alleged § 8(a)(3) violations, the employer's improper motive for discharge must be shown to dominate. In the case at bar, respondent contends that the proper motive, i. e., a complete closedown for econom-

ic reasons, was the dominant motive behind the discharges of Clark and Harness. Assuming *arguendo* that there was a complete closedown of respondent's operation, we are not persuaded that *Western Exterminator* is applicable to the case at bar.

In *Western Exterminator*, we noted that that case dealt with review of an isolated discharge of a single employee, where the action of the employer was not "inherently destructive" of § 7 rights. 565 F.2d 1114, 1117 n. 2. In *Portland Willamette Co. v. N. L. R. B.*, 534 F.2d 1331 (9th Cir. 1976), this court listed examples of inherently destructive activity which included "permanent discharge for participation in union activities." 534 F.2d 1331, 1334. In the case at bar, it is our belief that respondent's conduct was inherently destructive in that employees Clark and Harness were discharged at least partially for their expressed desire to obtain union assistance in attaining compliance with the collective bargaining agreement as is their right under § 7 of the Act. Therefore, we hold that in the case at bar, the Board need not prove that the improper motive was dominant.

*II–C—Violation of Section 8(a)(5) and (1) by Repudiation of a Lawful Agreement with the Union.*

The Board concluded that respondent intended to proceed with a piecemeal escape from the contract in that (1) in March 1976 fringe benefits for mechanics were stopped; (2) the contractual mandate for a general wage increase scheduled for July 1976 was ignored; and (3) in October 1976 fringe benefit contributions for drivers were stopped.

■ Respondent argues that the contract with the Teamsters was void *ab initio* because it was signed by Yotter who was not an officer of AFCO, and although she had been an officer of Alcan, in September 1975 the State of Alaska had dissolved Alcan's certificate of incorporation. The administrative law judge rejected this authorization argument because he concluded that Lantz continued to operate under the Alcan style. The Board contends that under an apparent authority theory, Lantz is

bound by Yotter's signature on the contract because she told Union representative Sinnet that she was authorized to sign the contract for Alcan. The Board asserts that Lantz ratified the contract in that for a period of time after the execution of the contract, respondent complied with its terms, and that whether Alcan was a *de jure* corporation is unimportant because neither capacity to contract nor "employer" status under the Act is dependent upon incorporation, citing *N. L. R. B. v. New Madrid Mfg. Co.*, 215 F.2d 908 (8th Cir. 1954).

Finally, the Board points out that when the Union brought a damage suit against Alcan, based on the contract, Lantz himself agreed to make up the delinquent trust fund contributions in exchange for dismissal of the suit.

We agree with the Board and hold that the contract of January 7, 1976, was binding upon respondent under a theory of apparent authority and ratification.

Respondent next argues that the contract is an unlawful pre-hire contract which does not conform with § 8(f) of the Act. It is established that the Act does not require the making of an agreement nor prevent the employer from hiring individuals on whatever terms the employer may, by unilateral action, determine; and the Act does not interfere with the normal exercise of the right of the employer to select his employees or to discharge them, so long as he does not, under cover of such right, intimidate or coerce his *employees* with respect to their self-organization, representation, and collective bargaining rights. 48 Am.Jur.2d *Labor and Labor Relations*, § 1096. It is these employee rights which are the rights sought to be protected in prohibiting employer domination through illegal pre-hire agreements in all non-construction industries. In the case at bar, there has been no protest by the Union or individual employees, regarding these rights. We hold that Lantz, as an employer, has no standing to champion these employee rights, and will not be permitted to use § 8(f) to attack the validity of the contract and thereby shield himself from liability for employer unfair labor practices.

Respondent's final argument regarding the § 8(a)(5) violation is that § 10(b) of the Act precludes finding of an unfair labor practice premised on events occurring more than six months prior to the filing of the charge. We find this argument without merit in the case at bar, in that it was not clear that respondent was totally repudiating the collective bargaining agreement until within six months prior to the filing of the March 1977 charges. Therefore, the piecemeal actions of respondent during 1976 were properly considered by the Board. *N. L. R. B. v. R. O. Pyle Roofing Co.*, 560 F.2d 1370 (9th Cir. 1977).

In summary, we hold that the Board's findings of violations of Section 8(a)(1), (3) and (5) of the National Labor Relations Act are supported in the record by substantial evidence.

ENFORCEMENT GRANTED.