640 F.2d 924
 103 L.R.R.M. (BNA) 3120, 88 Lab.Cas. P 11,998
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BIG BEAR SUPERMARKETS # 3 and its alter ego Richard Holmes,
Respondent.
Amalgamated Meat Cutters & Butchers Workerman of North
America, AFL-CIO, Intervenor.
 No. 79-7100.
 United States Court of Appeals,
Ninth Circuit.
 April 2, 1980.
Rehearing Denied May 22, 1980.
Certiorari Denied Oct. 20, 1980. See 101 S.Ct. 318.
 
 David A. Fleischer, N.L.R.B., Washington, D. C., on brief, for petitioner.
 Richard D. Prochazka, San Diego, Cal., Edwin C. Schreiber, Beverly Hills, Cal., George King, Oakland, Cal., (argued), for respondent; Charles J. Eisner, Oakland, Cal. on brief.
 Application for Enforcement of an Order of the National Labor Relations Board.
 Before GOODWIN, HUG, and SKOPIL, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 The National Labor Relations Board petitions this court for enforcement of its order finding Big Bear Supermarkets #3 ("Big Bear") in violation of section 8(a)(1), (3) & (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) & (5). The Board found that Big Bear violated section 8(a)(1) & (5) of the Act by repudiating collective bargaining agreements covering employees of Big Bear's market in La Mesa, California, and by refusing to recognize and bargain with the Retail Clerks Union Local 1222 and the Amalgamated Meat Cutters Union Local 229. The Board also found that Big Bear violated section 8(a)(1) & (3) of the Act by transferring employees from the La Mesa market because of their union representation.
 
 
 2
 The principal issue of this appeal is whether Big Bear and Richard Holmes, franchisee of the La Mesa market, are a single employer within the meaning of section 2(2) of the Act. The Board's findings of unfair labor practices are based on its conclusion that Holmes is the alter ego of Big Bear, and therefore that Holmes and Big Bear are a single employer rather than parties to a bona fide franchise agreement. We affirm the decision of the Board and grant enforcement of its order.
 
 
 3
 * Facts
 
 
 4
 Big Bear owns and operates a chain of markets in the San Diego area. For over 20 years, the Retail Clerks Union and the Meat Cutters Union have acted as the exclusive bargaining representatives for Big Bear employees who are members of multi-store bargaining units at Big Bear meat and grocery markets. At the time this controversy arose, Big Bear was party to a collective bargaining agreement with the Retail Clerks Union that ran from July 28, 1975 to July 30, 1978, and was party to a collective agreement with the Meat Cutters Union that ran from November 8, 1976 to November 4, 1979. Each collective agreement covered Big Bear employees at the La Mesa market.
 
 
 5
 In each of the two fiscal years ending July 31, 1975 and July 31, 1976, the Big Bear market at La Mesa suffered net losses totalling more than $50,000. The financial difficulties were principally due to a series of state condemnations that dramatically reduced the parking space for the shopping center in which the La Mesa market is located.
 
 
 6
 Effective November 15, 1976, Big Bear franchised the La Mesa market to Richard Holmes, a former store manager at another Big Bear market. The parties stipulated in the record before us that the La Mesa market is the only operation that has been franchised by Big Bear.[1] Holmes is the son of a director, officer and shareholder of Big Bear.
 
 
 7
 Big Bear transferred the union employees at the La Mesa market to other Big Bear operations, and Holmes hired new employees. Neither union was notified of the transfer. Moreover, although the collective agreement with the Retail Clerks Union provides that employees subject to transfer are entitled to a seven-day period to accept the transfer or to apply for employment with the new owner, none of the transferred employees was given that option. Big Bear and Holmes have refused to apply the terms of the collective agreements to the new La Mesa employees, to recognize or bargain with the Unions with respect to those employees, and to comply with the request of the Retail Clerks Union for the names and addresses of the new employees that work in job classifications falling within the bargaining unit represented by the Retail Clerks Union.
 
 
 8
 The Unions filed unfair labor practice charges against Big Bear. The General Counsel for the Board issued a complaint alleging that the La Mesa store is an alter ego of Big Bear within the meaning of section 2(2) of the Act, and that the franchise arrangement was a sham transaction motivated by Big Bear's desire to retain control over the La Mesa market while cutting losses by avoiding the terms of the collective agreements. Holmes was permitted to intervene in the case and to participate fully in the proceedings before the Administrative Law Judge ("ALJ").
 
 
 9
 John Mabee, president and principal stockholder of Big Bear, testified before the ALJ that the decision to franchise the La Mesa market was prompted by legitimate business considerations. He testified that the market was sold to minimize further losses, but that the Big Bear name was retained through the franchise arrangement to prevent encroachment on its market share in the area and to maintain a "draw" to the La Mesa shopping center, which Mabee himself owns and leases to several commercial tenants.
 
 
 10
 The franchise agreement recites that the parties intend Holmes to act as an independent contractor rather than as an agent of Big Bear. The agreement is in many respects patterned after a contract that has been held by the Board in Southland Corporation, 170 N.L.R.B. 1332 (1968), to afford the franchisee the status of an independent contractor. However, the La Mesa franchise agreement departs significantly from the Southland agreement in its provisions relating to rent, advertising, termination of the agreement, and inventory.
 
 
 11
 The franchise agreement allows Big Bear to retain significant control over the operations of the La Mesa store with respect to product lines, advertising, honoring of advertised specials and discount coupons, issuance of trading stamps, and supervision and technical assistance. Although Holmes, as franchisee, is allowed to exercise some managerial discretion not granted to managers of Big Bear markets, in many circumstances he must obtain approval from Big Bear before exercising that discretion, and failure to obtain such approval is cause for termination of the franchise agreement. The La Mesa market retains its appearance as part of the Big Bear system.
 
 
 12
 Holmes has full control over the hiring and firing, work schedules, working conditions, and compensation of the new employees at the La Mesa market. The new employees earn lower wages and benefits than are provided for in the collective agreements.
 
 
 13
 Of particular importance are the financial provisions of the franchise agreement. Holmes leases the premises and equipment at the La Mesa market from Big Bear. He purchased $116,400.81 in inventory with an unsecured promissory note for that amount and a down payment of $2,000 on the note. The note bears an interest rate of 5%, and the franchise agreement provides for periodic payments on the note, partially based on Holmes's net earnings, with no apparent time limit for repayment.[2]
 
 
 14
 Big Bear performs accounting services for Holmes through a system known as the Open Account. Big Bear pays the expenses for the operation of the La Mesa market, debiting that amount to the Open Account; Holmes deposits his daily sales receipts with Big Bear, resulting in a credit to the Open Account. Because many operation expenditures necessarily precede sales receipts from the market's operation, the Open Account provides Holmes with an interest-free advance of funds for business expenses.[3]
 
 
 15
 The franchise agreement provides that Big Bear will remit to Holmes, and debit to the Open Account, a weekly "draw on anticipated profits" in the amount of $425, roughly equivalent to salaries earned by managers of Big Bear stores. This amount is guaranteed regardless whether any profit is currently earned by the La Mesa market.
 
 
 16
 Nothing in the express provisions of the franchise agreement shifts from Holmes the ultimate risk of loss if the market fails, but Big Bear apparently is obligated to carry losses forward through the Open Account until the agreement is terminated for cause. Although Big Bear may sue Holmes on the promissory note in the event of failure of the La Mesa market, the note is not secured by any of Holmes's property to protect Big Bear from absorbing possible losses. Profits earned through operation of the market are divided between Big Bear and Holmes, 40% to Big Bear and 60% to Holmes.
 
 
 17
 On these facts, the ALJ concluded that the franchise arrangement was an arm's length transaction motivated by legitimate business considerations. Accordingly, he rejected the General Counsel's alter ego theory and recommended dismissal of the complaint.
 
 
 18
 Contrary to the ALJ, the Board concluded that the franchise agreement was a sham transaction, that Holmes is Big Bear's alter ego with respect to the La Mesa store, and that Holmes and Big Bear constitute a single employer under section 2(2) of the Act. The Board found that Big Bear violated section 8(a) (1) & (5) by refusing to recognize or bargain with the Unions with respect to the La Mesa market, by refusing to apply the terms of the collective agreements to the new La Mesa employees, and by refusing to supply the Retail Clerks Union with the requested information about the new employees. Additionally, the Board found that Big Bear violated section 8(a)(1) & (3) by transferring the former La Mesa employees because of their union representation. The Board ordered Big Bear to cease committing the unfair labor practices and to engage in affirmative remedial action. The Board's decision is reported at 239 N.L.R.B. No. 26 (1979).
 
 
 19
 The Board petitions for enforcement of its order pursuant to 29 U.S.C. § 160(e). We granted the motion of the Meat Cutters Union to intervene in the enforcement proceedings.
 
 II
 Standard of Review
 
 20
 We must enforce the Board's order if the Board correctly applied the law and if the Board's findings of fact are supported by substantial evidence on the record viewed as a whole. Los Angeles Marine Hardware Co. v. NLRB, 602 F.2d 1302, 1305 (9th Cir. 1979); Loomis Courier Service, Inc. v. NLRB, 595 F.2d 491, 494 (9th Cir. 1979). Because the ultimate findings of the Board are contrary to those of the ALJ, we must pay particular attention to the standard of review of the Board's findings of fact.
 
 
 21
 The standard of review does not change merely because the Board reaches a conclusion contrary to that of the ALJ. Id. at 495; NLRB v. Warren L. Rose Castings, Inc., 587 F.2d 1005, 1008 (9th Cir. 1978). The ALJ's decision is part of the record and necessarily detracts from the support for the Board's contrary decision, but the Board's findings of fact must be upheld if supported by substantial evidence on the record as a whole. Id. Moreover, in light of the special expertise of the Board, we will defer to the reasonable derivative inferences drawn by the Board from credited evidence. Penasquitos Village, Inc. v. NLRB, 565 F.2d 1074, 1079 (9th Cir. 1977); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); NLRB v. Lantz, 607 F.2d 290, 297 (9th Cir. 1979).
 
 
 22
 On the other hand, because the ALJ sees and hears the witnesses, he or she is in the best position to draw testimonial inferences and to make findings with respect to credibility. Pensaquitos Village, 565 F.2d at 1078-79. Consequently, credibility resolutions of the ALJ are entitled to special weight, and findings of the Board that are contrary to those credibility resolutions will be subjected to particularly critical scrutiny. See id. at 1079; Loomis, 595 F.2d at 495-96; Butler-Johnson Corp. v. NLRB, 608 F.2d 1303, 1305 (9th Cir. 1979).
 
 III
 Single-Employer Status
 
 23
 The Board's findings of unfair labor practices are premised on its conclusion that Big Bear and Richard Holmes constitute a single employer within the meaning of section 2(2) of the Act.[4] In NLRB v. Don Burgess Construction Corp., 596 F.2d 378 (9th Cir.), cert. denied, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979), we set forth the factors to be considered by the Board in determining whether to treat two or more distinct business entities as a single employer:
 
 
 24
 (T)he criteria to which the Board looks in order to determine single employer status are (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. The Board has stressed the first three of these factors, as well as the presence of control of labor relations. However, no one of the factors is controlling, nor need all criteria be present. Single employer status ultimately depends on "all the circumstances of the case" and is characterized as an absence of an "arm's length relationship found among unintegrated companies."
 
 
 25
 Id. at 384 (citations omitted). Accord, Lantz, 607 F.2d at 295.[5] The Board's conclusion that Big Bear and Holmes constitute a single employer "is essentially a factual one and not to be disturbed provided substantial evidence in the record supports the Board's findings." Id.
 
 
 26
 The findings of the ALJ and the Board are consistent with respect to the facts relevant to the first criterion of the single-employer test, interrelation of operations. The business purpose, equipment, and customers of the La Mesa market remained substantially the same before and after the franchise arrangement, and Big Bear performed accounting services for Holmes. These factors show a sufficient degree of interrelation of operations to favor a finding of single-employer status. Cf. Marine Hardware Co., 602 F.2d at 1305 (same customers; central preparation of payroll and financial statements); Don Burgess, 596 F.2d at 385 (same equipment and accounting service, among other factors).
 
 
 27
 The ALJ and the Board are not in agreement in their evaluation of the facts relating to the second criterion, common management. The ALJ characterized Big Bear's supervision of the La Mesa market as "technical assistance" that did not favor a finding of single-employer status. The Board, on the other hand, found that "Big Bear retains under the contract terms a substantial number of controls over the operation of the La Mesa store," so that "the franchised store continues to operate essentially as any other Big Bear market, with Big Bear actively exercising its contractual prerogatives." The franchise agreement specifically permits Big Bear to exercise limited control over several aspects of the operation of the La Mesa market. In addition, the agreement includes a general clause relating to supervision:
 
 
 28
 Big Bear shall provide such supervision and technical assistance to (Holmes) as may be reasonably necessary to establish the business, and in any event no less supervision than is provided to other markets in the Big Bear system.
 
 
 29
 The record shows that to a significant degree Big Bear exercised the control granted to it in the agreement. The Board's characterization of Big Bear's control over the La Mesa market is the product of reasonable derivative inferences drawn from credited evidence. We find that the common-management criterion favors a finding of single-employer status.
 
 
 30
 The critical criterion in this case, and the one causing the greatest disagreement between the ALJ and the Board, is that relating to common ownership or financial control. Whereas the ALJ found that the franchise agreement validly transferred ownership of the La Mesa market from Big Bear to Holmes, the Board concluded that the agreement was a sham transaction executed for the purpose of permitting Big Bear to evade its collective bargaining obligations.
 
 
 31
 The record supports the Board's finding that the franchise arrangement was not executed for valid business considerations. The Board correctly notes in its decision that the franchise arrangement did not create a remedy for the principal financial problem at the La Mesa store, lack of parking space. Instead, the agreement allowed Holmes to reduce operating expenditures through avoidance of the terms of the collective agreements. Moreover, the Board reasonably inferred that one of the reasons Big Bear unconditionally transferred the union employees from the La Mesa market was to help Holmes avoid the status as a "successor employer" with concomitant bargaining obligations.[6]
 
 
 32
 Finally, the financial provisions of the agreement are uncharacteristic of a bona fide transfer of ownership. For a small initial capital investment of $2,000, Holmes assumed nominal ownership of a business with an inventory valued at more than $100,000 and with annual sales of more than $1,000,000. Big Bear advances the operating expenses for the La Mesa market, including a guaranteed salary for Holmes commensurate with the salaries earned by managers of other Big Bear stores. Big Bear claims a substantial portion of the profits earned by the La Mesa store as its franchise fee. Although Holmes bears ultimate responsibility for losses suffered by the La Mesa market, the obligation is unsecured and Big Bear's ability to avoid absorbing losses is dependent upon Holmes's personal financial solvency and ability to repay the promissory note in the event of failure of the market.
 
 
 33
 The ALJ's conclusion that the franchise agreement was executed for legitimate business considerations appears to be based partly on the ALJ's determination to credit the testimony of President Mabee on that issue, as well as on the ALJ's interpretation of the franchise agreement. The Board's conclusion is based principally upon the franchise agreement itself and the method in which business was conducted under the franchise agreement. The Board drew different derivative inferences from these undisputed historical facts than did the ALJ. Even giving deference to the ALJ's finding concerning the credibility of Mabee's expressed intention, there is sufficient substantial evidence from which the Board could reasonably have found to the contrary. Accordingly, we uphold the Board's finding that the franchise arrangement was a sham transaction executed for the purpose of evading Big Bear's bargaining obligations. We find that the criterion relating to common management or financial control favors a finding of single-employer status.
 
 
 34
 The remaining criterion, control over labor relations, is ordinarily accorded special significance. See, e. g., Marine Hardware Co., 602 F.2d at 1305. Holmes exercised full control over labor relations at the La Mesa market after the union employees were transferred, and Big Bear argues that this precludes a finding of single-employer status.
 
 
 35
 The Board, however, gave little weight to Holmes's exercise of control over labor relations, due to its finding that the franchise agreement was not a bona fide, arm's length transaction. We uphold this application of the law by the Board. The presence of all four criteria of the single-employer test is not necessary to a finding of single-employer status; the ultimate question is whether there is an absence of an arm's length relationship between the business entities in question. Don Burgess, 596 F.2d at 384. It would make little sense to give weight to Holmes's control over labor relations in light of the Board's supportable finding that the purpose of the franchise agreement was the evasion of bargaining obligations; transfer of control over labor relations from Big Bear to Holmes helped to effectuate that improper purpose.
 
 
 36
 Viewing the record as a whole, we find that substantial evidence supports the Board's finding that Big Bear and Holmes constitute a single employer within the meaning of section 2(2) of the Act.
 
 IV
 Unfair Labor Practices
 A. Transfer of the La Mesa Employees
 
 37
 Section 8(a)(1) of the Act provides that it shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their statutory rights to engage in or refrain from engaging in concerted activity for the purpose of organizing or bargaining collectively. 29 U.S.C. §§ 157, 158(a)(1). Section 8(a)(3) provides that it shall be an unfair labor practice for an employer to engage in employment discrimination to encourage or discourage membership in any labor organization. 29 U.S.C. § 158(a)(3).
 
 
 38
 We find that substantial evidence supports the Board's finding that Big Bear violated section 8(a)(1) & (3) by transferring the union employees from the La Mesa market. A finding of a violation of section 8(a)(3) ordinarily requires specific proof of antiunion animus on the part of the employer. See Marine Hardware Co., 602 F.2d at 1307. Because we uphold the Board's finding that Big Bear franchised the La Mesa store for the purpose of evading its bargaining obligations with the Unions, and because the transfer of the union employees formed an integral part of the scheme to transform the La Mesa market into a nonunion shop, we find the requisite proof of antiunion animus. The transfer therefore constituted unlawful employment discrimination in violation of the Act. Cf. id. (discharge of employees was "inherently destructive," obviating need for specific proof of animus).
 
 B. Breach of Bargaining Obligations
 
 39
 Section 8(a)(5) of the Act provides that it shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees. 29 U.S.C. § 158(a)(5). The Board found that, within the job classifications covered by the collective agreements, the employees at the La Mesa market and the employees at the other Big Bear markets constitute an appropriate bargaining unit. We uphold that determination as a proper exercise of the Board's discretion.[7] Therefore, because we uphold the Board's finding that Big Bear and Holmes constitute a single employer, we find that the record supports the Board's findings that Big Bear breached its bargaining obligations.
 
 
 40
 Big Bear's refusal, through Holmes or other agents, to recognize or bargain with the Unions with respect to the new employees at the La Mesa market constitutes an obvious violation of section 8(a)(1) & (5). Furthermore, Big Bear's refusal to apply the terms of the collective agreements to the new employees constitutes a mid-term repudiation of the agreements in violation of section 8(a)(1) & (5). See Marine Hardware Co., 602 F.2d at 1306-07; Lantz, 607 F.2d at 299-300. Finally, it is not disputed that the request of the Retail Clerks Union for the names and addresses of the new employees was necessary for bargaining purposes; therefore, Big Bear violated section 8(a)(1) & (5) by failing to supply the requested information. See Standard Oil Co. v. NLRB, 399 F.2d 639 (9th Cir. 1968).
 
 
 41
 The Board correctly applied the law, and substantial evidence on the record as a whole supports its findings of fact. Therefore, we affirm the Board's findings of unfair labor practices.
 
 
 42
 PETITION FOR ENFORCEMENT GRANTED.
 
 
 
 [1]
 Appended to the brief filed by the Meat Cutters Union are letters written by a representative of Big Bear and addressed to the Unions. They indicate Big Bear's intention to reacquire the La Mesa market from Holmes and to sell that market and another Big Bear store to independent managers for operation under the Big Bear name. The Meat Cutters Union requests this court to take judicial notice of the letters as adjudicative facts pursuant to Fed.R.Evid. 201. We decline to take judicial notice of the contents of the letters, because the Meat Cutters Union has failed to establish that the information in the letters is not subject to reasonable dispute, as required by Fed.R.Evid. 201(b). We take no notice of the letters in our evaluation of the Board's petition to enforce its order
 
 
 [2]
 The Board found an apparent error in the decision of the ALJ with respect to the extent that Holmes made principal payments on the note in excess of the payments required by the agreement. We find this disagreement between the Board and ALJ to be immaterial
 
 
 [3]
 Holmes asserts that Big Bear benefits from the interest-free use of funds from sales receipts deposited into the Open Account daily by Holmes. However, Big Bear would enjoy a net benefit only if Holmes's share of the profits deposited in the Open Account exceeded the operating expenses advanced by Big Bear. There is no indication in the record that such was the case
 
 
 [4]
 Section 2(2) provides in part:
 "The term 'employer' includes any person acting as an agent of an employer, directly or indirectly . . . ."
 
 
 [5]
 The Board did not list the specific criteria that it considered in determining single-employer status; rather it based its finding of a single employer in this case primarily upon its conclusion that the franchise agreement was a sham transaction. The ALJ applied the "alter ego" test set forth in Crawford Door Sales Co., 226 N.L.R.B. 1144 (1976), which calls for substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership. These are essentially the same factors that are examined in evaluating the four criteria of the "single-employer" test set forth in our decision in Don Burgess. See generally Naccarato Construction Co., 233 N.L.R.B. 1394, 1398 (1977). We have applied the Don Burgess test to cases involving a business firm that takes over the operations of a predecessor entity, e. g., Marine Hardware Co., 602 F.2d 1302, and those involving concurrently operating, interrelated enterprises, e. g., Lantz, 607 F.2d 290. In each case, the ultimate question is whether the business entities in question constitute a single employer within the meaning of section 2(2) of the Act; the criteria of the Don Burgess test are sufficiently flexible to permit application of the test to varying fact situations
 
 
 [6]
 Even in the case of a bona fide transfer of assets, a successor employer may be held to the bargaining obligations of its predecessor if there is a substantial continuity of identity of the workforce. See Howard Johnson Co. v. Hotel & Restaurant Employees, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974)
 
 
 [7]
 An element in addition to the four criteria of the single-employer test must be present before the Board may impose the terms of a collective bargaining agreement signed by one of the business entities upon the nonsignatory entity. See generally Naccarato, 233 N.L.R.B. at 1398-99. To justify that remedial action, we have held that the employees of each business entity must constitute an appropriate bargaining unit. Don Burgess, 596 F.2d at 386. In this case, the Board adopted the multi-store bargaining unit stipulated by the parties to be appropriate. Moreover, we note that the Board's order does not operate directly against Holmes, the nonsignatory party. Rather, the Board found that Big Bear, as the continuing employer of the La Mesa employees, unlawfully repudiated the collective agreement to which it was a party