WESTERN EXTERMINATOR
COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INDUSTRIAL CARPENTERS UNION,
LOCAL NO. 2565, Respondent.

Nos. 76–2293, 76–2617.

United States Court of Appeals,
Ninth Circuit.

Dec. 7, 1977.

Stanley E. Tobin (argued), of Hill, Farrer & Burrill, Los Angeles, Cal., for petitioner.

Michael S. Winer (argued), Washington, D. C., David A. Rosenfeld (argued), San Francisco, Cal., for respondent.

Before WALLACE and SNEED, Circuit Judges, and BOLDT,* District Judge.

WALLACE, Circuit Judge:

This case is before us on a Petition for Review and Application for enforcement of a decision of the National Labor Relations Board holding that both the employer and the union committed certain unfair labor practices in connection with the discharge of a particular employee. We grant enforcement as to certain aspects of the Board's Decision and Order, which are not attacked on appeal. As to the Board's finding of violations of section 8(a)(3) and section 8(b)(2) of the National Labor Relations Act, however, we deny enforcement.

I

Western Exterminator Company (Western) operates some eighteen separate facilities engaged in the pest control industry. Western's field employees are divided generally into two main groups, termite control and nuisance pest control. During the period from October 1, 1974 to September 30, 1977, the termite employees in Western's Oakland branch were covered by a collective bargaining agreement between Western and the Structural Pest Control Division of the Industrial Carpenters Union Local No. 2565 (Union).

On October 26, 1973, Macias, a Union member, applied for employment at Western's Oakland branch. Macias was interviewed by Hoffman, the senior termite inspector. Hoffman hired Macias upon his representation that he was a journeyman termite-worker.

On November 12, 1974, Macias attended a contract ratification meeting at which Hoffman, as president of the Union, presided. During the course of this meeting, Worley, a Union member, challenged Hoffman's dual position as company supervisor and Union president. Hoffman asked Worley where he had obtained his information and Worley pointed to Macias who was seated next to him. Other Union members subsequently challenged Hoffman's Union position and he responded by offering to settle the matter outside.

The following day, when Macias reported for work, Hoffman asked him what he had said to Worley at the union meeting. Macias responded that he had merely told Worley that Hoffman was the senior termite inspector at Western. Hoffman shook his head and walked away.

During the closing months of 1974, Western's business suffered an unusually severe seasonal decline. In late November or early December, Hoffman and Doucette, the Oakland branch manager, determined that

* Honorable George H. Boldt, United States District Judge, Western District of Washington, sitting by designation.

the reduction in business necessitated the layoff of one or more termite-workers. On December 9, Macias returned from vacation and went to the coffee room to await his day's assignment. About 8:00 a. m. Hoffman entered the room and dispatched all of the termite-workers except Macias. Hoffman then went to Doucette's office. He returned within a few minutes and informed Macias that Doucette wanted to see him. Macias reported to Doucette's office and was told that he was being laid off as a result of the lack of work. Macias asked if he would be recalled when work increased, and Doucette responded affirmatively.

In early January 1975, Macias telephoned Doucette to inquire about his prospects of returning to work. When Doucette told him that work was still slack, Macias protested that he had more seniority than two termite-employees who were still working. Doucette responded that he was unaware of such matters and suggested that Macias call Hoffman. Macias did so and repeated what he had told Doucette. Hoffman advised Macias that the controlling collective bargaining agreement contained no seniority provisions. After further protestations by Macias, Hoffman told him that he had no intention of calling him back to work, in any event, because of his poor work record and marginal competency as a journeyman termite-worker.

On January 23, 1975, Macias instituted Union grievance procedures on the basis of his discharge. Macias subsequently filed unfair labor practice charges against both Western and the Union. On the basis of these charges, the General Counsel of the National Labor Relations Board issued a complaint against Western and the Union alleging certain violations of the National Labor Relations Act (NLRA). Specifically, the General Counsel charged Western with violating sections 8(a)(3) and (1), 29 U.S.C. § 158(a)(3) and (1), by discharging Macias for engaging in protected Union activities, and sections 8(a)(2) and (1), 29 U.S.C. § 158(a)(2) and (1), by allowing one of its supervisors to act as a Union official. The General Counsel also alleged that the Union had violated section 8(b)(2), 29 U.S.C.

§ 158(b)(2), by causing Western to discharge Macias, and section 8(b)(1)(A), 29 U.S.C. § 158(b)(1)(A), by failing to process properly Macias' grievance.

The administrative law judge (ALJ) held that Western and the Union had violated section 8(a)(2) and section 8(b)(1)(A), respectively. The ALJ declined, however, to find violations of sections 8(a)(3) and 8(b)(2). A three-member panel of the NLRB sustained the ALJ's finding of section 8(a)(2) and section 8(b)(1)(A) violations. The Board disagreed with the ALJ, however, with respect to the section 8(a)(3) and section 8(b)(2) allegations and held that Western and the Union had committed unfair labor practices by discharging Macias. The Board ordered Western to reinstate Macias and, together with the Union, to remunerate Macias for any loss of wages incurred as a result of the discriminatory discharge.

The parties are now before us on Western's Petition for Review and the Board's applications for enforcement of its Decision and Order. At oral argument, counsel for Western and the Union acceded to the section 8(a)(2) and section 8(b)(1)(A) violations, respectively. Western and the Union vigorously contend, however, that the NLRB's finding of section 8(a)(3) and section 8(b)(2) violations are not supported by substantial evidence. We agree.

## II

The essence of the Board's argument is that Macias' exercise of section 7 rights in publicizing Hoffman's dual role as Union president and company supervisor was a contributing factor in Western's decision to discharge Macias. This nexus, the Board asserts, is established by Hoffman's participation in the decision to discharge Macias.

The ALJ found that Doucette had identified Macias as the termite man to be laid off and that Hoffman's role in the decision was limited to concurrence. The ALJ also found, and it is not disputed, that Doucette had no knowledge of Macias' Union activities. Accordingly, the ALJ found that Western, acting through its agent, Dou-

cette, did not violate section 8(a)(3) by discharging Macias.

The Board rejected these findings and held, instead, that Hoffman had "played a significant role in the layoff of Macias." In light of Hoffman's position as the object of the controversy generated by Macias' protected activities, the Board concluded that the discharge was, "at least in part," illegally motivated.

We deem the Board's finding that Hoffman played a significant role in the decision to discharge Macias to be supported by "substantial evidence on a record as a whole." NLRA § 10(f); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Arriving at this conclusion is not without difficulty. If Doucette, who admittedly knew nothing of the union problem, made the decision to fire Macias without instigation by Hoffman, the obvious result is that the firing was without antiunion animus. The ALJ determined that

> a fair appraisal of the testimony warrants the conclusion that it was Doucette who decided that a layoff was necessary, that he suggested to Hoffman that Macias be laid off, that after considering the matter for several days, Hoffman concurred in Doucette's recommendation, and that Doucette made the final decision as to Macias' layoff.

Admittedly, the ALJ was in a better position to assess credibility. This does not mean, however, that testimonial conflicts are conclusively resolved by the ALJ. See Penasquitos Village, Inc. v. NLRB, 565 F.2d

1. In subsequent testimony, both Hoffman and Doucette equivocated on this point. Nevertheless, their original assertions and pre-hearing affidavits are supportive of the Board's finding that Hoffman played a significant role in Macias' discharge.

2. Although no such position has been argued in this case, we do recognize that under certain circumstances an employer's conduct can violate section 8(a)(3) without any proof of antiunion animus. In general, such cases occur when the employer's conduct is "inherently destructive" of section 7 rights. NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 33, 87 S.Ct.

1074, 1080 (9th Cir. 1977). In spite of the finding by the ALJ, there is substantial evidence that Hoffman originally targeted Macias as the termite man to be laid off. For example, at the administrative hearing, both Hoffman and Doucette testified that it was Hoffman who first suggested that Macias be the employee to be laid off.[1] In addition, in his pre-hearing affidavit, Doucette stated that it was Hoffman who initially suggested Macias as the one to be laid off. Also, in his pre-hearing affidavit, Hoffman stated that he, Hoffman, had laid off Macias.

One additional consideration lends very significant support to the Board's finding. On December 9, Macias was assured by Doucette that he would be recalled when business increased. In January, it was Hoffman who, in essence, converted the economic layoff into a permanent discharge by telling Macias that he would not, in any event, be recalled.

■■■ Therefore, we are persuaded that the Board's finding that Hoffman did in fact play a significant role in Macias' discharge is supported by substantial evidence. This conclusion does not, however, end our scrutiny of the Board's decision. Even though Hoffman was significantly involved in the firing and assuming he was, at least partially, motivated by Macias' Union activities, we are still presented with a discharge which was motivated by multiple factors. Thus, the central issue is: How significant of a role must the antiunion animus play in the discharge in order to constitute a violation of section 8(a)(3)?[2]

1792, 18 L.Ed.2d 1027 (1967); Portland Willamette Co. v. NLRB, 534 F.2d 1331, 1334 (9th Cir. 1976). However, in reviewing an isolated discharge of a single employee this analysis is inappropriate. Otherwise, the discharge of any employee who participates in union affairs might violate section 8(a)(3) regardless of whether the employer's motives were entirely proper. In cases such as this, the burden is on the NLRB and reviewing courts "to determine whether the employer has acted purely [for legitimate purposes] or has sought to damage employee organization." American Ship Building Co. v. NLRB, 380 U.S. 300, 311, 85 S.Ct. 955, 963, 13 L.Ed.2d 855 (1965).

It is a long-standing rule of law within our circuit that where a discharge is motivated by both a legitimate business consideration and protected union activity, "[t]he test is whether the business reason or the protected union activity is the moving cause behind the discharge." *NLRB v. West Coast Casket Co.*, 469 F.2d 871, 874 (9th Cir. 1972), *quoting NLRB v. Ayer Lar Sanitarium*, 436 F.2d 45, 50 (9th Cir. 1970); *accord, NLRB v. Miller Redwood Co.*, 407 F.2d 1366, 1370 (9th Cir. 1969); *Signal Oil & Gas Co. v. NLRB*, 390 F.2d 338, 341 (9th Cir. 1968); *NLRB v. Security Plating Co.*, 356 F.2d 725, 728 (9th Cir. 1966). *See also, Mead v. Retail Clerks Local 839*, 523 F.2d 1371, 1377 n.7 (9th Cir. 1975). *But see, NLRB v. Central Press*, 527 F.2d 1156 (9th Cir. 1975). Stated conversely, "[w]here a party has two motives, one permissible and the other impermissible, the better rule is . . . that the improper motive must be shown to have been the dominant one."

*Famet, Inc. v. NLRB*, 490 F.2d 293, 296 (9th Cir. 1973), *quoting NLRB v. Lowell Sun Pub. Co.*, 320 F.2d 835, 842 (1st Cir. 1963) (Aldridge, J., concurring).[3] *See generally,* Comment, *Employer Discrimination Under Section 8(a)(3)*, 5 Tol.L.Rev. 722, 765 (1974).

The ALJ found, and the record is virtually clear, that during December 1974, economic conditions dictated the layoff of at least one termite employee and that Macias was the least competent of Western's termite employees.[4] These two factors strongly militate in favor of a conclusion that proper business considerations constituted the dominant and moving cause of Macias' discharge. By the same token, our review of the entire record indicates that the only evidence supporting a conclusion that Macias' discharge was motivated by his Union activities, is Macias' own testimony that Hoffman's attitude vis-a-vis Macias became hostile after the November 12, 1974

---

**3.** The various circuits are sharply divided on the issue of the "quantum of animus" necessary for a section 8(a)(3) violation. *See NLRB v. Montgomery Ward & Co.*, 554 F.2d 996, 1002 (10th Cir. 1977) (partially motivated); *Neptune Water Meter Co. v. NLRB*, 551 F.2d 568, 570 (4th Cir. 1977) (no discharge except for); *Oil, Chem. & Atomic Workers Int'l Union v. NLRB*, 178 U.S.App.D.C. 278, 293, 547 F.2d 575, 590 (1977), *cert. denied,* —— U.S. ——, 98 S.Ct. ——, 54 L.Ed.2d —— (motivated in any part); *NLRB v. Townhouse T.V. & App., Inc.*, 531 F.2d 826, 828 (7th Cir. 1976) (motivated at least in part); *NLRB v. Gentithes*, 463 F.2d 557, 560 (3rd Cir. 1972) (substantial or motivating cause); *NLRB v. Fibers Int'l Corp.*, 439 F.2d 1311, 1312 (1st Cir. 1971) (dominant motive); *NLRB v. Gladding Keystone Corp.*, 435 F.2d 129, 131 (2d Cir. 1970) (partially motivated); *Frosty Morn Meats, Inc. v. NLRB*, 296 F.2d 617, 621 (5th Cir. 1961) (moving cause). *See generally,* R. Gorman, Labor Law 137–42 (1976).

An analysis of the Supreme Court opinions in this area leads us to conclude that our position, that antiunion animus must be the dominant or moving cause, is the better rule. The Court has held that where the employer's conduct is inherently destructive of section 7 rights, unlawful motivation is presumed to exist. *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *NLRB v. Brown*, 380 U.S. 278, 287, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *American Ship Building Co. v. NLRB*, 380 U.S. 300, 311, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 228, 83 S.Ct. 1139, 10

L.Ed.2d 308 (1963); *Radio Officers' Union v. NLRB*, 347 U.S. 17, 45, 74 S.Ct. 323, 98 L.Ed. 455 (1954). Even where illegal animus is presumed to exist, however, the Board need not find a violation of the Act.

> [S]uch situations [inherently destructive employer conduct] present a complex of motives and preferring one motive to another is in reality the far more delicate task, reflected in part in decisions of this Court, of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct.

*NLRB v. Erie Resistor Corp., supra*, 373 U.S. at 228–29, 83 S.Ct. at 1145–1146. *See also, NLRB v. Great Dane Trailers, supra*, 388 U.S. at 33–34, 87 S.Ct. 1792; *American Ship Building Co. v. NLRB, supra*, 380 U.S. at 311–12, 85 S.Ct. 955.

Thus, since in those cases where discriminatory animus is presumed to exist the Board and courts may nevertheless uphold the employer's conduct, we believe that in a case, such as the one before us, where the employer's conduct is not inherently destructive, the Board and courts, a fortiori, are not *compelled* to find a section 8(a)(3) violation where the antiunion animus is but one of multiple motivating factors.

**4.** The Board did not disturb these findings of the ALJ.

union meeting. Macias' testimony on this point, however, is highly inconsistent.[5] Additionally, Macias' co-workers unanimously testified that they perceived no change in Hoffman's attitude toward or treatment of Macias following the November 12 meeting. We thus find no substantial evidence upon which to base a conclusion that Macias' union activities were the dominant or moving cause of his discharge.

We do not believe our analysis of the facts is necessarily different from that of the Board. Indeed, the Board never found that the dominant motive of Hoffman's actions was antiunion animus. The Board merely concluded that "Hoffman's illegal motivation was at least part of the basis for Macias' layoff." This, of course, is not the dispositive test.

The Board's finding that the Union violated section 8(b)(2) is based solely on Hoffman's status as a Union official at the time of the layoff. As already discussed, however, there is no substantial evidence that Hoffman's involvement in Macias' discharge was predominantly motivated by Macias' union activities.

Accordingly, we grant enforcement of the Board's Decision and Order with respect to the section 8(a)(2) and section 8(b)(1)(A) violations. Enforcement is denied as to the section 8(a)(3) and section 8(b)(2) violations.

---

**5.** Macias testified that prior to the November 12 meeting, he and Hoffman were "real good friends," that they went to a bar together on paydays, and that Macias occasionally brought Hoffman fruit. In addition, Macias testified that after the meeting, this relationship deteriorated to the point that Hoffman declined to say "good morning." At a much later point in the hearing, however, Macias testified that during the *entire* period of his employment, Hoffman had mistreated him because of his race and on many occasions had declined to say "good morning."