**ROYAL DEVELOPMENT CO., LTD., Petitioner/Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner.**

Nos. 81–7638, 81–7736.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 9, 1982.

Decided Feb. 22, 1983.

Robert Katz, Jeffrey Harris, Honolulu, Hawaii, for petitioner/cross-respondent.

William R. Stewart, Gen. Counsel, N.L. R.B., Washington, D.C., for respondent/cross-petitioner.

Before CHAMBERS and WALLACE, Circuit Judges, and JAMESON,* District Judge.

WALLACE, Circuit Judge:

In this case, we are confronted with apparently conflicting labor law precedents. The legal issues are significant and require our careful analysis. The case stems from the entry of an order by the National Labor Relations Board (the Board) holding Royal Development Company (Royal) in violation of subsections 8(a)(1), 8(a)(3), and 8(a)(4) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1), (3), and (4), for its refusal to rehire Schmidt, both because he engaged in union and other protected, concerted activity, and because he filed an unfair labor practice charge against Royal with the Board. The Board ordered Royal to cease and desist from its violations, to post appropriate notices, and to reinstate Schmidt with back pay. Royal filed a petition for review under 29 U.S.C. § 160(f); the Board cross-applied for enforcement of its order pursuant to 29 U.S.C. § 160(e). We order enforcement of the Board's decision on the 8(a)(3) and 8(a)(4) charges, but deny enforcement of its decision on the 8(a)(1) charge.

## I

As of early 1978, Royal operated at least six movie theaters, including the King and Queen Theaters. Royal had an agreement with the union,[1] covering its movie projectionists, including employee Schmidt. Under this agreement, a movie projectionist was designated as a regular projectionist, a relief projectionist, or a casual projectionist. A regular projectionist was defined as one who was assigned a minimum of either 30 or 36 hours per week.[2] A relief projectionist was one who was assigned a minimum of

three shifts per week, and a casual projectionist was not guaranteed any hours. Grievances were to be filed with the union, although an exception allowed grievances to be filed with the employee's immediate supervisor.

Miller was Royal's vice president, and Petroni was Royal's chief projectionist and the supervisor of all projectionists, including Schmidt. Petroni prepared the work schedules for all of Royal's projectionists at all Royal theaters. He also scheduled projectionists for movie theaters other than Royal's, even though he was employed full-time by Royal. Since the union did not have a hiring hall, Petroni, at the request of the union, used the same list of projectionists for all scheduling.

Schmidt was employed as a regular projectionist by Royal from 1973 until he was laid off in November, 1978, as a result of Royal's reduced operating schedule. On June 15, 1978, while still employed as a regular projectionist, Schmidt filed a written grievance with Petroni. He complained that although he was scheduled for only 24 to 26 hours per week, Wheeler, another regular projectionist for Royal, was scheduled for 50 to 60 hours per week. After Petroni stated that Schmidt had "no right to file grievances," Schmidt filed the same grievance with Miller. Receiving no response, he sent a second letter to Miller in which he advised Miller that Petroni also worked for a second employer. He sent copies of these grievances to the union business representative. When asked by the administrative law judge (ALJ) whether the grievance was solved under the arbitration provision of the contract, Schmidt stated that the "union sided with the company and ruled against me."

---

* Honorable William J. Jameson, United States District Judge, District of Montana, sitting by designation.

1. Local No. 665, International Alliance of Theatrical Stage Employees and Moving Pictures Machine Operators of the United States and Canada, AFL–CIO.

2. The contract is contradictory: it defines a regular projectionist as one "who is regularly assigned a minimum of 30 hours per week," but later states that "[e]ach regular projectionist shall be offered a minimum of 36 hours per week." The conflict is immaterial in this case because Schmidt claims that he was being scheduled for less than 30 hours a week.

On July 26, Schmidt filed subsection 8(a)(1), 8(a)(2), and 8(a)(3) unfair labor charges with the Board stating that Royal had reduced his work hours and changed his job classification in response to the grievance and other union activities, and that Petroni, as a member of management, was functioning as the union's shop steward. The Board dismissed the charges.

In October 1978, Schmidt sent a series of letters to Alameda, the union president, demanding that the union file written grievances because Schmidt was being scheduled for fewer hours than those specified in the agreement for a regular projectionist. On October 13, 1978, Miller wrote to the union explaining that Royal had filled its contractual obligations to Schmidt by offering him shifts at other theaters which would have guaranteed him the required minimum hours per week. The letter further stated that "Mr. Schmidt's contention represents an attempt to subvert the contract and his continual harassment can no longer be tolerated."

On November 17, 1978, Miller notified the union by letter that, due to discontinuance of operations at some of its theaters, it would be necessary to reduce the number of shifts available to regular projectionists and to eliminate casual and relief projectionists. Schmidt's position was reduced from a regular to a relief projectionist because he was the last hired. Schmidt was laid off later in November, but Petroni continued to schedule him as a regular projectionist at the Queen Theater, which by then had been sold by Royal.

When Parker, a regular projectionist employed by Royal at the King Theater, became ill, Schmidt was rehired as a casual projectionist to cover some of Parker's shifts. In July, Ohata, who had more seniority than Schmidt, requested and received one of Schmidt's shifts. When Parker died, a regular projectionist vacancy was created. Parker's shifts were given to Ohata. This in effect terminated Schmidt's employment as a casual projectionist with Royal. On August 4, 1979, the Queen Theater was purchased by a new owner and Schmidt's employment at the theater was discontinued. When Schmidt asked Petroni when he would be scheduled for work for Royal, Petroni stated he would be unable to schedule Schmidt because Miller was "fed up" and wanted nothing more to do with him. Petroni also responded that Schmidt had "dragged [Miller] through hell with all that nonsense with the NLRB" for what Miller indicated was no reason.

Schmidt filed a grievance with Miller protesting his termination and requesting that he be reemployed as a regular projectionist. He also requested a meeting with Miller and a union officer to discuss Petroni's statements and to examine a three inch file that Petroni stated Miller had compiled on Schmidt. In response, Miller told Schmidt that he would not be rehired. Schmidt testified that when he spoke with Petroni on August 18 and on August 25, 1979, he was told that he had performed competently as a projectionist, but that he was not being scheduled because Miller did not want to rehire him.

The ALJ found that Royal violated subsections 8(a)(1), 8(a)(3), and 8(a)(4) of the Act by refusing to rehire Schmidt. The Board concurred with the ALJ.

II

We must enforce the Board's order if the Board correctly applied the law and if the Board's findings of fact are supported by substantial evidence in the record viewed as a whole, *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Nevis Industries, Inc.,* 647 F.2d 905, 908 (9th Cir. 1981) (*Nevis Industries*), even if we might reach a different conclusion based on the same evidence. *Id.*

Subsection 8(a)(3) provides that it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]" 29 U.S.C. § 158(a)(3). Under subsection 8(a)(4), it is also an unfair labor practice "to discharge or otherwise discriminate against

an employee because he has filed charges or given testimony under [the Act.]" 29 U.S.C. § 158(a)(4). These subsections are implicated in Schmidt's case because the ALJ found that he was discharged for presenting grievances to the union and for filing an unfair labor practice charge with the Board. The crucial question is whether the refusal to rehire was motivated by anti-union animus or instead by legitimate business reasons.

We are confronted first with the question of what standard should be applied to determine the real motive of Royal. The Board employed its *Wright Line* test. *Wright Line, A Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Royal claims that this was error and that the "dominant motive" test should apply. A survey of Ninth Circuit decisions shows that there is some confusion as to what is the correct standard in employee discharge cases.

Until recently, it was clear that we followed the dominant motive test. In *Western Exterminator Co. v. NLRB,* 565 F.2d 1114 (9th Cir.1977) (*Western Exterminator*), we stated that:

> "[t]he test is whether the business reason or the protected union activity is the *moving cause* behind the discharge." Stated conversely, "[w]here a party has two motives, one permissible and the other impermissible, the better rule is . . . that the improper motive must be shown to have been the dominant one."

*Id.* at 1118, *quoting NLRB v. West Coast Casket Co.,* 469 F.2d 871, 874 (9th Cir.1972), *and Famet, Inc. v. NLRB,* 490 F.2d 293, 296 (9th Cir.1973) (citations omitted) (emphasis added). We have followed this test repeatedly since our decision in *Western Exterminator. See, e.g., Ad Art, Inc. v.*

*NLRB,* 645 F.2d 669, 678 (9th Cir.1981) (*Ad Art*); *NLRB v. Anchorage Times Publishing Co.,* 637 F.2d 1359, 1366–67 (9th Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 137, 70 L.Ed.2d 115 (1981) (*Anchorage Times*); *L'Eggs Products, Inc. v. NLRB,* 619 F.2d 1337, 1341–42 (9th Cir.1980) (*L'Eggs*); *NLRB v. Sacramento Clinical Laboratory, Inc.,* 623 F.2d 110, 113 (9th Cir.1980); *NLRB v. Bighorn Beverage,* 614 F.2d 1238, 1242 (9th Cir.1980) (*Bighorn*); *Stephenson v. NLRB,* 614 F.2d 1210, 1213 (9th Cir.1980) (*Stephenson*).[3] In our cases employing the dominant motive standard, we stated that the burden to prove that a discharge was motivated by anti-union animus was on the Board. *Anchorage Times, supra,* 637 F.2d at 1367; *L'Eggs, supra,* 619 F.2d at 1341; *NLRB v. Adams Delivery Service, Inc.,* 623 F.2d 96, 99 (9th Cir.1980) (*Adams*).

In 1980, the Board sought to end the apparent confusion in the circuits about the standard for determining motive by announcing a new causation test to be used in all 8(a)(3) cases, as well as in 8(a)(1) cases, which turned on employer motivation. In *Wright Line, supra,* the Board wrote:

> First, we shall require that the General Counsel make a *prima facie* showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.

251 N.L.R.B. at 1089 (footnote omitted). As has become clear, the Board's *Wright Line* test contains both substantive and procedural aspects. Substantively, the test incorporates a "but for" standard for determining an employer's real motive in discharging an employee. The question to be asked is whether the employee would have been discharged but for the exercise of pro-

---

**3.** The only pre-*Wright Line* case to contradict this line of precedent is *NLRB v. Lantz,* 607 F.2d 290 (9th Cir.1979) (*Lantz*), which applied a more lenient standard to an employee discharge case. In *Lantz,* we only required the employee to show that his discharge was "partially" motivated by union activity. *Id.* at 299.

As we have observed before, the *Lantz* case created a difficult to understand distinction and, as a result, has been confined to its particular facts. *L'Eggs Products, Inc. v. NLRB,* 619 F.2d 1337, 1341–42 (9th Cir.1980). The Board does not argue that the more lenient *Lantz* standard is the law of this circuit.

tected rights. Procedurally, the *Wright Line* standard shifts the burden of proof to the employer to show his innocence. Once the Board establishes a prima facie case by proving that an improper motive was a reason for the discharge, the burden shifts to the employer to prove that the discharge would have occurred absent the protected activity.

It has recently been observed that there is a conflict among the circuits on the *Wright Line* test. *Red Ball Motor Freight, Inc. v. NLRB,* 456 U.S. 997, 102 S.Ct. 2282, 73 L.Ed.2d 1293 (1982) (White, J., dissenting from denial of certiorari). A review of the circuit decisions, however, reveals that the conflict relates only to the procedural, burden-shifting aspect of *Wright Line.* Some circuits have adopted the *Wright Line* standard entirely. *See NLRB v. Fixtures Manufacturing Corp.,* 669 F.2d 547, 550 & n. 4 (8th Cir.1982); *Red Ball Motor Freight, Inc. v. NLRB,* 660 F.2d 626, 627–28 (5th Cir.1981) (per curiam), *cert. denied,* 456 U.S. 997, 102 S.Ct. 2282, 73 L.Ed.2d 1293 (1982); *NLRB v. Lloyd A. Fry Roofing Co.,* 651 F.2d 442, 446 (6th Cir. 1981). The Second Circuit has also followed *Wright Line* in its entirety, although only in dicta. *Consolidated Edison Co. v. Donovan,* 673 F.2d 61, 62–63 (2d Cir.1982). The First and Third Circuits have adopted the Board's *Wright Line* "but for" test but have rejected the burden-shifting part of the *Wright Line* rule. *NLRB v. Wright Line, A Division of Wright Line, Inc.,* 662 F.2d 899, 902–07 (1st Cir.1981) (enforcing the Board's *Wright Line* decision; rejecting shifting of burden of persuasion but not of burden of production), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *Behring International, Inc. v. NLRB,* 675 F.2d 83, 87–89 (3d Cir.1982) (*Behring*) (also rejecting shifting of burden of persuasion). The Seventh Circuit originally adopted *Wright Line* completely, *see Peavey Co. v. NLRB,* 648 F.2d 460, 461 (7th Cir.1981), but more recently has rejected the burden-shifting approach of *Wright Line. NLRB v. Webb Ford, Inc.,* 689 F.2d 733, 739 (7th Cir.1982) (rejecting shifting of burden of persuasion).

In the last year, cases in this circuit have followed the *Wright Line* standard in its entirety, thus apparently departing, at least in part, from our prior pronouncements. Four cases have adopted the standard specifically. *See NLRB v. Brooks Cameras, Inc.,* 691 F.2d 912, 915 (9th Cir.1982); *Doug Hartley, Inc. v. NLRB,* 669 F.2d 579, 580–81 (9th Cir.1982); *Zurn Industries, Inc. v. NLRB,* 680 F.2d 683, 686–93 (9th Cir.1982) (*Zurn Industries*); *Nevis Industries, supra,* 647 F.2d at 909. Two other cases indicate in dicta that we have adopted the *Wright Line* standard. *Anja Engineering Corp. v. NLRB,* 685 F.2d 292, 296 & n. 10 (9th Cir. 1982); *Lippincott Industries, Inc. v. NLRB,* 661 F.2d 112, 115 (9th Cir.1981) (*Lippincott Industries*). Thus, two lines of cases exist in this circuit, one which places the burden of proof on the Board to establish an employer's unlawful "dominant motive" and one which places the burden on the employer, subject to a prima facie showing by the Board, to prove that an employee's protected activities were not the "but for" cause of his discharge.

■ Trying to reconcile these two lines of cases raises questions of the nature of our function in relation to that of the Board. The Board argues that the former line of cases has been overruled *sub silencio* by our subsequent cases. Ordinarily a decision of a panel of our court cannot overturn a previous panel decision. The decisions in both *Nevis Industries* and *Zurn Industries,* however, seem to indicate that our only duty was to ascertain whether the Board's *Wright Line* rule was a reasonably defensible interpretation of the Act consistent with its purposes. *See Zurn Industries, supra,* 680 F.2d at 689; *Nevis Industries, supra,* 647 F.2d at 909, both citing *NLRB v. Local Union No. 103, International Association of Iron Workers,* 434 U.S. 335, 350–51, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978) (*Iron Workers*), and *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). Citing *Iron Workers, supra,* 434 U.S. at 350–51, 98 S.Ct. at 660, we stated in *Nevis Industries* that the Board is not disqualified from altering its rules, and when it does so, we must not construe the statute de novo. 647 F.2d at 909.

We do not believe that *Iron Workers* and *Ford Motor Co. v. NLRB* are in point. More important, proper consideration of the proposed *Wright Line* standard requires careful consideration of our purpose in relation to the Board. Such consideration will assist us in interpreting the law of our circuit.

■ It is true that the Board is free to change its mind and, absent any court rulings, the Board's latest judgment is entitled to deference. *Iron Workers, supra,* 434 U.S. at 350–51, 98 S.Ct. at 660. In the present case, however, Ninth Circuit precedent had established a standard in dual motive cases before the Board announced its new *Wright Line* standard. The question posed is thus whether, each time the Board changes its mind, we are required to reverse our earlier contrary rulings if the Board's new interpretation is consistent with the Act.

We have found very little law in this area, apparently because it has been assumed that circuit courts are bound by their earlier precedent regardless of what the Board has done in the interim.[4] We are assisted by *NLRB v. J. Weingarten, Inc.,* 485 F.2d 1135 (5th Cir.1973), *rev'd,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), in which the Board sought to distinguish a Fifth Circuit precedent in analyzing the issue whether an employee has a right to have a union member accompany him to an investigatory interview. The Fifth Circuit stated, "the Board is well aware that it must distinguish the Fifth Circuit *Texaco* case or that decision would be binding precedent upon us, absent en banc reconsideration." 485 F.2d at 1137. Finding that the precedent could not be distinguished, the court overturned the Board's decision. *Id.* at 1137–38. Although the Supreme Court reversed, it did not quarrel with the circuit court's statement of its relationship

with the Board. The Supreme Court stated that it did not matter whether the Fifth Circuit precedent was distinguishable, since it was rejecting both the Fifth Circuit precedent and the case at hand. 420 U.S. at 264, 95 S.Ct. at 967. By deciding the case on the merits, however, the Court implicitly acknowledged that the Fifth Circuit was not precluded from following its rule that it could not overrule its own precedent, absent an en banc hearing, even though the Board's ruling conflicted with that precedent.

There are also policy reasons for refusing to adopt a Board decision that conflicts with our earlier precedent absent an en banc convening of the court. In effect, the Board would be free to "reverse" circuit decisions whenever its membership changed, thus relegating the courts of appeals to a minor supervisory role over the Board. This, we believe, would be inconsistent with our appellate process. Therefore, we must be careful not to interpret *Nevis Industries* and *Zurn Industries* as overruling *Western Exterminator,* because neither case was taken en banc.

In light of this, we next examine the two lines of cases to see if they can be reconciled. If the *Wright Line* standard is consistent with our previous precedent, we are free to adopt it. We will examine first the substantive change developed by *Wright Line,* and then the procedural change.

As was pointed out above, *Wright Line* adopted a "but for" test for employee discharge cases involving dual motivation. We see no conflict between this test and the dominant motive standard first employed in *Western Exterminator.* Indeed, we have stated several times that the dominant motive and but for standards are essentially equivalent. For example, in *Lippincott Industries, supra,* we stated, "[w]e note in

---

**4.** *See, e.g.,* Winter, *Judicial Review of Agency Decisions: The Labor Board and the Court,* 1968 Sup.Ct.Rev. 53, 72–73. Professor Winter states that when a court either reverses the Board or affirms it on grounds other than that the Board's decision was within agency discretion, "a future Board will be precluded from changing the rule because the doctrine of *stare decisis* will lead to judicial reversal of its decision." *Id.* As pointed out earlier, we have established the test to be employed in employee discharge cases, *Western Exterminator Co. v. NLRB,* 565 F.2d 1114, 1118 (9th Cir.1977), and that precedent cannot be reversed by the Board.

passing that the Board's decision in *Wright Line,* while changing the procedural requirements, nonetheless applies a test designed to identify whether protected union activity was the *moving cause* behind the discharge." 661 F.2d at 115 (citation omitted) (emphasis added); *see Anchorage Times, supra,* 637 F.2d at 1366–67. In *Stephenson, supra,* a pre-*Wright Line* case, we wrote:

> Although the court has previously expressed concern that the two standards may diverge, *see Polynesian Cultural Center, Inc. v. N.L.R.B.,* 582 F.2d 467, 473–74 (9th Cir.1978), they are equivalent. Thus, we conclude that anti-union animus must be the motivating factor, i.e., the "but-for" cause of the discharge to give rise to an unfair labor practice.

614 F.2d at 1213 (citation omitted); *accord Adams, supra,* 623 F.2d at 99. Although one may construct a hypothetical case in which the standards may produce slightly different results, we have not been able to find a case from this circuit in which a different decision would have been rendered if one or the other of the standards had been used. Thus, we conclude that the *Wright Line* substantive standard is essentially the same standard that we have applied since *Western Exterminator,* and that the Board did not err in adopting the substantive aspect of the *Wright Line* standard.

We have more difficulty with *Wright Line*'s procedural standard. The First and Third Circuits rejected the procedural aspects of the *Wright Line* rule because they found the burden shifting to be inconsistent with the Act. *Behring, supra,* 675 F.2d at 88–90; *NLRB v. Wright Line, A Division of Wright Line, Inc., supra,* 662 F.2d at 903–07. In an extensive analysis in *Zurn Industries, supra,* we decided that the burden shifting is not inconsistent with the Act. 680 F.2d at 689–93. That, of course, goes to the issue. whether the Board's change is consistent with the Act. Consistency with the Act, however, is only the first level of analysis. The second step focuses upon whether or not the Board's rule change is consistent with our prior precedent. We hold that it is not. As was pointed out above, in the series of cases employing the dominant motive standard, the burden of proof clearly is on the Board to prove that a discharge was motivated by anti-union animus.

We are therefore confronted with two lines of conflicting precedent, one that places the burden of persuasion on the Board and another that places it on the employer after a prima facie showing by the Board. It might be possible to reconcile the two if we could read *Wright Line* as requiring only that the employer come forth with evidence of legitimate business motive, i.e., if he shouldered the burden of production of evidence, but not the burden of persuasion. This interpretation would make the *Wright Line* test similar to the procedural requirements for demonstrating discrimination in a Title VII case. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The *Wright Line* test, however, clearly places the burden of proof on the employer. The shift is significant. Our experience teaches that not infrequently, a legitimate business reason and an unlawful motive seem to be relatively evenly balanced. A change in the burden of persuasion, therefore, will affect the outcome in a significant number of cases. Thus, we find it impossible to reconcile the two lines of precedent.

While we acknowledge this conflict in our circuit's precedents, we do not need to await its resolution to decide this case.[5] We find that the Board's rulings on the 8(a)(3) and 8(a)(4) violations are supported by substantial evidence no matter who has the burden of proof.

---

**5.** It would be imprudent for us to attempt to resolve this conflict, not only because its resolution is not necessary to decide this case, but also because the Supreme Court recently granted certiorari in a case that squarely presents the burden-shifting issue. *See NLRB v. Transportation Management Corp.,* 674 F.2d 130 (1st Cir.) (per curiam), *cert. granted,* —— U.S. ——, 103 S.Ct. 372, 74 L.Ed.2d 506 (1982).

### III

Schmidt filed repeated grievances and he also filed an unfair labor practice charge with the Board. If he was fired because of these activities, Royal violated subsections 8(a)(3) and 8(a)(4) of the Act.

Royal claims, on the contrary, that the real reason for the discharge was that Schmidt's continual harassment of Petroni led Miller to fear that Petroni would resign if Schmidt were not discharged. It claims that this is a legitimate business reason and that Schmidt would have been fired regardless of his union activities. To buttress this claim, and to counter the inference that the protected activities led to Schmidt's discharge, Royal points out that there was a considerable time lag between the protected activities and Schmidt's discharge and its failure to rehire him. The unfair labor practice charge was dismissed in August 1978, a full year before Schmidt was finally discharged. The last grievance was filed with the union in late 1978, almost nine months before the discharge.

Remoteness in time between protected activities and a decision not to rehire is evidence that the decision was not in retaliation for the protected activities. On the other hand, remoteness in time is not sufficiently probative to disprove discriminatory intent in all circumstances. Here, the inference of illegal motivation is supported by Schmidt's testimony quoting Petroni's statement that Miller fired Schmidt because he had "dragged [Miller] through hell with all that nonsense with the NLRB." This testimony is substantiated by Petroni's own affidavit which states that "Mr. Miller has told me he has grown tired of all the trouble Schmidt has caused over the years. This trouble has resulted in Schmidt filing grievances against the company as well as charges against the company with the NLRB." [6] Royal contends that Miller did not know about these grievances, but this argument is directly refuted by a letter from Miller on October 13, 1978 in which he states that Schmidt "had once again filed a grievance" that had no merit. Furthermore, the grievances filed were at least colorably meritorious and apparently brought in good faith. Hence, they are protected under 8(a)(3) whether or not they resulted in formal grievance proceedings.

Even assuming its acts were partially the result of unlawful motives, Royal contends that the real reason that it fired Schmidt was the fear of losing Petroni. Under the *Wright Line* standard, the argument is that Schmidt would have been fired even absent his filing an unfair labor practice charge with the Board and grievances with the union. This contention, however, is directly contradicted by Petroni's own statement. Furthermore, the ALJ pointed to evidence which refutes Royal's contention. First, there is no evidence to show that Petroni was on the verge of quitting. In fact, Petroni told Schmidt that he was willing to offer Schmidt a job except for the fact that the company no longer wanted to employ him. This statement casts doubt on Royal's claim that Schmidt had to be fired to retain Petroni. It also contradicts other statements by Miller and Petroni that there was no work to be offered. The ALJ also pointed ed to contradictory evidence offered by Petroni on seniority and the activities surrounding the filling of the job created when Parker died.

The ALJ also discovered contradictions in Royal's position concerning Schmidt's com-

---

**6.** Royal contends that this testimony should be excluded because, at the hearing, Petroni refused to authenticate the page of his affidavit on which this testimony appears. The ALJ refused to credit Petroni's disclaimer for several reasons: Petroni admitted that a name written on the page was in his own hand; he admitted that initials appearing next to two written modifications on the page were his, although he would not admit writing these initials; the affidavit would not make sense substantively without this page; and Petroni tried to disavow or mitigate this and other portions of the affidavit although he admitted being instructed to read it carefully before signing and stated that he complied with those instructions. The ALJ's determinations concerning the credibility of witnesses are given great weight. *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1078–79 (9th Cir. 1977). She did not act unreasonably in admitting the page of the affidavit.

petence. At the time of the discharge, no one told Schmidt that he was not rehired because of incompetence and there was no evidence that Royal thought Schmidt to be incompetent. Later, however, both Petroni and Miller claimed that this was the real reason for the firing. Now Royal argues in its brief that it never questioned Schmidt's competence. These contradictions give rise to two observations. First, a failure to mention to an employee an asserted reason for adverse action at the time the action is taken can indicate a discriminatory motive for the discharge. *See Great Chinese American Sewing Co. v. NLRB,* 578 F.2d 251, 254–55 (9th Cir.1978). Second, we have stated that "[w]here the employer's asserted justification is shifting and unreliable, its case is weakened, and the conclusion that the true reason was for union activity is correspondingly · strengthened." *Nevis Industries, supra,* 647 F.2d at 910. These and other contradictions in the testimony of Miller and Petroni raise the inference that Royal is grasping for reasons to justify its refusal to rehire Schmidt.

The ALJ could conclude, based on this record, that the company's assertion that it only wanted to save Petroni is a mere pretext. Whether or not the asserted reason is a pretext does not change our analysis. Although some courts have found a difference between dual motive cases and pretext cases, we have stated that in terms of the legal standard to be applied, the difference between the two is of little importance. *Lippincott Industries, supra,* 661 F.2d at 114–15. If the company's asserted reason is found to be pretextual, it will clearly fail to pass the test that the employee would have been discharged but for his exercise of protected rights.

In conclusion, there is substantial evidence that Royal would not have refused to rehire Schmidt but for his filing grievances with the union and but for his filing an unfair labor practice with the Board. In this case, it does not matter upon whom the burden of persuasion is placed. Either way, Royal cannot justify its conduct. The Board's order as to the 8(a)(3) and 8(a)(4) charges is enforced.

## IV

This does not end our inquiry, however, for we must also consider the Board's finding of a violation of subsection 8(a)(1). Subsection 8(a)(1) states that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 . . . ." 29 U.S.C. § 158(a)(1). Section 157 states that the Act protects employees' right "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157. Thus, Schmidt is entitled to reinstatement under subsection 8(a)(1) only if he was discharged for engaging in protected, concerted activity.

An employee engages in concerted activity under section 157 when he acts "with or on behalf of other employees, and not solely by and on behalf of . . . himself." *NLRB v. C & I Air Conditioning, Inc.,* 486 F.2d 977, 978 (9th Cir.1973) (*C & I*), *quoting Pacific Electricord Co. v. NLRB,* 361 F.2d 310, 310 (9th Cir.1966) (per curiam). There, we held that an employee who threatens to walk off a job after complaining to his foreman about unsafe work conditions is not engaging in concerted activity because he is acting only in his own behalf. Likewise, an employee does not engage in concerted activities when he complains to a government regulatory agency about unsafe work conditions. *Bighorn, supra,* 614 F.2d at 1242. An individual employee's complaint may be transformed into concerted activity if the union becomes involved in processing the complaint or aids the employee in asserting the complaint before management. Thus, we have held that an employee's complaint regarding overtime pay becomes concerted activity when he contacts a union official, who then calls the employer to relate the employee's concern. *Adams, supra,* 623 F.2d at 100; *see Ad Art, supra,* 645 F.2d at 678.

Royal argues that Schmidt was acting only for himself, because there is no evidence that any other projectionists were

upset by Petroni's scheduling. It further argues that Schmidt did not follow the proper grievance procedure by taking his grievances to the union first, but instead filed his grievances directly with Miller and Petroni. Moreover, to the extent that the union was involved, it refused to process the complaint.

Nevertheless, the Board found that Schmidt was engaged in concerted activity under the *Interboro* doctrine, in that he was seeking to enforce provisions of the collective bargaining agreement. This doctrine was first announced by the Second Circuit in *NLRB v. Interboro Contractors, Inc.,* 388 F.2d 495 (2d Cir.1967), in which an employee complained both to his employer and to his union that the employer was violating various terms of the collective bargaining agreement. The court held that even if an employee is the sole protagonist, "activities involving attempts to enforce the provisions of a collective bargaining agreement may be deemed to be for concerted purposes even in the absence of such interest by fellow employees." *Id.* at 500. Schmidt complained that he was not being scheduled for the number of hours he was due under the contract. Thus, under the *Interboro* doctrine, Schmidt's activity would clearly be protected concerted activity because, through his complaints, he was seeking to enforce a provision of the collective bargaining agreement.

The *Interboro* doctrine has met with a mixed reaction in the other circuits. The Eighth Circuit has adopted the doctrine, reasoning that the rights under an agreement, though personal, are concerted because the bargaining agreement is the result of concerted activity by employees for their mutual aid and protection. *NLRB v. Selwyn Shoe Manufacturing Corp.,* 428 F.2d 217, 221 (8th Cir.1970); *accord NLRB v. Ben Pekin Corp.,* 452 F.2d 205, 206 (7th Cir.1971) (per curiam); *Roadway Express, Inc.,* 217 N.L.R.B. 278 (1975), *enforced without opinion,* 532 F.2d 751 (4th Cir.1976).

Other circuits have rejected the doctrine because it expands the Act's coverage in spite of the unambiguous words of the statute. *See ARO, Inc. v. NLRB,* 596 F.2d 713, 718 (6th Cir.1979); *NLRB v. Buddies Supermarkets, Inc.,* 481 F.2d 714, 719 (5th Cir. 1973); *NLRB v. Northern Metal Co.,* 440 F.2d 881, 884 (3d Cir.1971); *see also Kohls v. NLRB,* 629 F.2d 173, 176–77 (D.C.Cir. 1980) (expressing serious doubts about the validity of the doctrine), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1390, 67 L.Ed.2d 363 (1981).

The Board argues that *Interboro* is the law of this circuit. It refers us to language from *Adams, supra,* which states that we have adopted the *Interboro* doctrine "in principle." The Board relies too much on this statement and overlooks the holding of the case. In *Adams* we found that we did not need to apply the *Interboro* doctrine to the facts of that case. 623 F.2d at 100. Furthermore, a look at the holdings of the two cases cited in *Adams* as supporting this court's agreement with *Interboro* reveals that we have not adopted the *Interboro* doctrine. In *C & I, supra,* we stated in dicta that we did "not disagree in principle" with *Interboro,* but we found that it was unnecessary to reach the *Interboro* question because the discharged individual did not designate the collective bargaining agreement as the source of his claimed rights. 486 F.2d at 978–79. In fact, there was no evidence that the employee intended to implement rights under the collective bargaining agreement. Likewise, in *Bighorn, supra,* we refused to apply the *Interboro* doctrine because there was no collective bargaining agreement. 614 F.2d at 1242. A discharged employee claimed that he was fired for filing a safety complaint and that his action constituted concerted activity. We held that the employee's action was not protected concerted activity, and that *Interboro* did not apply because there was no collective bargaining agreement to enforce. *Id.*[7]

---

**7.** The Board also cites *NLRB v. Maxwell,* 637 F.2d 698, 701 (9th Cir.1981), for the proposition that an individual's efforts to implement the contract rights under a collective bargaining agreement are protected activities under the Act. In *Maxwell,* however, we specifically

■ As we stated above, if we accept the *Interboro* doctrine, we must enforce the Board's finding of an 8(a)(1) violation. Thus, the question whether this circuit will follow the *Interboro* doctrine is now squarely before us for the first time. We reject the *Interboro* doctrine and find that Schmidt was not engaged in protected concerted activity. We agree with the courts which have stated that the *Interboro* doctrine goes beyond the express language of sections 157 and 158. The Act plainly states that an employee must be engaged in concerted activity to invoke its protection. Although it is true that the Board is to be granted deference in its interpretation of the Act, and that its interpretations will be followed on review unless shown to be inconsistent with the Act, *see Ford Motor Co. v. NLRB, supra,* 441 U.S. at 496–97, 99 S.Ct. at 1848–49, we find the *Interboro* doctrine to be inconsistent with the express language of the Act.

■ Without the aid of the *Interboro* doctrine, there is not substantial evidence in the record as a whole to support Schmidt's claim that he was engaged in concerted activity. It is clear that Schmidt was acting on his own and that no other employees were upset about Petroni's scheduling practices. Although Schmidt at times tried to involve the union, the union did not process his grievances and there is no evidence that the union became involved in any of Schmidt's complaints. Thus, his case is distinguishable from cases in which the union becomes actively involved by processing an employee's complaint or by helping him present his claim to management. *See Adams, supra,* 623 F.2d at 100. The mere act of complaining to the union cannot be considered concerted activity. In addition, although the contract is confusing as to the proper grievance procedure, Schmidt generally circumvented the union by choosing to complain, for the most part, directly to Petroni and Miller. Thus, the facts all tend to show that Schmidt was acting for himself and by himself. Thus, because Schmidt was not engaged in concerted protected activity, we reverse the Board's finding of a violation of subsection 8(a)(1).[8]

ENFORCEMENT GRANTED IN PART AND DENIED IN PART.

---

pointed out that the employer did not argue that the employee's attempts to enforce the provisions of the contract were not a protected activity. *Id.* at 701. We therefore did not need to address the issue.

8. We reject the suggestion by some commentators that a violation of 8(a)(3) will automatically be a violation of 8(a)(1). *See* R. Gorman, Basic Text on Labor Law 132 (1976); *see also* 2 J. Jenkins, Labor Law § 7.3 (1968) ("Union activity is the most common form of 'protected concerted activity' being included in, but not coextensive with, the latter term."). It is important to distinguish the two sections because the use of different terminology within a statute generally indicates that Congress intentionally made a differentiation. *See Lankford v. Law Enforcement Assistance Administration,* 620 F.2d 35, 36 (4th Cir.1980). It is insufficient to state that the result is academic because the Board's order will be enforced regardless of whether we find an 8(a)(1) violation. Congress requires concerted action for an 8(a)(1) charge and we cannot brush aside that requirement.